IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| TIERRA CALIENTE  MUSIC | § | |
| GROUP, S.A. DE C.V. D/B/A | § | CIVIL ACTION NO.: 7:18-CV-252 |
| REMEX MUSIC AND MIDAS | § | |
| MUSICAL, INC. | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | |
| | § | JURY TRIAL DEMANDED |
| SER-CA DISCOS, INC. | § | |
| Defendant. | § | |

## DEFENDANT'S THIRD AMENDED ANSWER AND COUNTERCLAIM

Defendant SER-CA DISCOS, INC. ("SER-CA," "Defendant," or "Counter-Plaintiff") files its Third Amended Answer and Counterclaim against Plaintiffs TIERRA CALIENTE MUSIC GROUP, S.A. DE C.V. d/b/a Remex Music ("Tierra Caliente"), Midas Musical, Inc. ("Midas") (collectively "Plaintiffs," or "Counter-Defendants"), and Third-Party Defendants JOHN DOES 1 – 10 ("Third-Party Defendants"), and would show unto the Court as follows:

### AFFIRMATIVE DEFENSES TO PLAINTIFFS' COMPLAINT

#### Facts Common to Affirmative Defenses

1.      Plaintiffs are infringers who have not alleged or shown copyright ownership and can never do so. Although the Plaintiffs' actions and claims are actually based on their claim of copyright ownership, they have not alleged, much less shown, valid copyright

ownership or copyright registration as required by 17 U.S.C. §§408(b), 411(a) and 1203. Without pleading or proof of a valid registration, the Plaintiffs' copyright claims should be dismissed *sua sponte*.

2.　　Plaintiffs lack standing because they own no valid legal rights in the 2016 Songs and are infringers. The Plaintiffs' purported claim to copyright ownership admittedly arises from the purported contract with Eliseo Robles of *La Leyenda,* who did not have the right to convey any rights.

3.　　On or about February 15, 2012, *La Leyenda* entered into a written Exclusivity and Assignment of Rights Agreement (the "Recording Agreement"), with Discos y Cintas SERCA, S.A. de C.V. ("SERCA MEXICO"), a Mexican record company. The Plaintiffs have admitted that the Recording Agreement between SERCA MEXICO and *La Leyenda* has never been invalidated by any Mexican court, despite the Plaintiffs' and *La Leyenda*'s many efforts to do so in lawsuits and trumped-up criminal charges. The Plaintiffs and their owners and agents have funded, participated in, and provided the legal representation for *La Leyenda* in the litigation in Mexico.

4.　　This litigation in Mexico resulted in a Final Judgment entered on or about September 4, 2017, in favor of SERCA MEXICO (the "Mexican Final Judgment"), which *La Leyenda* appealed via an Amparo proceeding and lost. The Plaintiffs and *La Leyenda* made a last, futile attempt to invalidate the Recording Agreement by filing and prosecuting an Amparo in the Third Collegiate Court of the Fourth Circuit of Monterrey, Nuevo Leon,

Mexico, which rejected their arguments. In fact, according to the Final Judgment rendered on June 15, 2018, by said Court in the Judgment on Direct Amparo 740/2017/3 (the "Mexican Amparo Judgment"), the Recording Agreement between SERCA MEXICO and *La Leyenda* was in full force and effect not only in 2015 when the Plaintiffs, their owners, and *La Leyenda* entered into their contracts and so-called Exclusivity Agreement, but also through the date of the recordings made for Plaintiffs by *La Leyenda*. A true and correct copy of the English translation of the Mexican Amparo Judgment is attached hereto as Exhibit A and a true and correct copy of the actual Mexican Amparo Judgment is labeled B; both incorporated herein by reference.

**First Defense**

5.    The Plaintiffs have no standing to bring this lawsuit. They do not have a valid contract with or copyright assignment from *La Leyenda*, do not own any rights to *La Leyenda*'s sound recordings, and are copyright infringers.

**Second Defense**

6.    The Plaintiffs are collaterally estopped from asserting copyright infringement claims.

**Third Defense**

7.    The Plaintiffs are not entitled to relief because they are collaterally estopped from seeking relief in Court.

**Fourth Defense**

8.   Plaintiffs' Complaint fails to state a claim for which relief may be granted. Alternatively, the demands and claims for relief are excessive.

**Fifth Defense**

9.   Plaintiffs have waived their claims.

**Sixth Defense**

10.   Defendant's actions were privileged and undertaken in good faith.

**Seventh Defense**

11.   Defendant was prevented by the Plaintiffs' wrongful actions from strict compliance with the requirements of the DMCA.

12.   Defendant reserves the right to add additional affirmative defenses or third-party claims against parties yet to be joined in this action, as investigation and discovery warrants.

## SPECIFIC RESPONSES TO THE PLAINTIFFS' COMPLAINT

13.   Subject to the foregoing defenses, Defendant further answers the specific numbered allegations as follows:

(a)   Defendant cannot admit or deny the allegations in ¶ 1 and ¶ 2;

(b)   With respect to ¶ 3, Defendant admits that it is a Texas corporation doing business in Hidalgo County, Texas and that it has appeared in this lawsuit;

(c)     Paragraph 4 contains legal conclusions that require no answer, except that the Defendant admits the jurisdictional allegations therein;

(d)     Defendant admits that Eliseo Robles, Jr. is a member of the Mexican regional music band performing under the name *La Leyenda*. If necessary, the remainder of ¶ 5 is denied;

(e)     Defendant cannot admit or deny the allegations in ¶ 6 - ¶ 9;

(f)     Defendant admits that it is the current legal representative of *La Leyenda* in the United States and denies that it is solely the "former" representative. The remainder of ¶ 10 is denied;

(g)     Paragraph 11 contains legal conclusions that require no answer;

(h)     Defendant denies the allegations in ¶ 12 - ¶ 15; and

(i)     Defendant denies that the Plaintiffs are entitled to the relief requested in the Prayer.

14.     Unless specifically admitted, Defendant denies the Plaintiffs' factual allegations and legal conclusions, whether express or implied.

## JURY DEMAND

15.     Defendant agrees with the Plaintiffs' jury demand and also demands trial by jury.

## REQUEST FOR RELIEF

16.     Defendant prays that the Court dismiss all of Plaintiffs' claims with prejudice, enter judgment in favor of Defendant, deny all equitable relief to Plaintiffs, award Defendant the costs of suit (including attorney's fees) and all other relief as the Court deems just and proper.

## THIRD AMENDED COUNTERCLAIM

17.     Defendant/Counter-Plaintiff SER-CA DISCOS, INC. ("SER-CA" or "Counter-Plaintiff") adopts all of the preceding paragraphs by reference and incorporates them into each paragraph of the counterclaim. This counterclaim arises out of the transactions and occurrences which are the basis for Plaintiffs' claims, involves factual and legal issues that are largely the same, and substantially the same evidence will support or refute the claims, whereby it is a compulsory within the meaning of Federal Rule of Civil Procedure 13(a).

## JURISDICTION AND VENUE

18.     The Court has exclusive subject matter jurisdiction as to the Counter-Defendants' Lanham Act violations pursuant to the Lanham Act, 15 U.S.C. §1051, et. seq. and 28 U.S.C.  §1338(a), and original jurisdiction over this counterclaim under 28 U.S.C. §1331 and 17 U.S.C. §512(f), the Copyright Act, 17 U.S.C. §§101, et. seq., for declaratory relief under the Declaratory Judgment Act, 28 U.S.C. §2201, as well as its ancillary and supplemental jurisdiction under 28 U.S.C.  §1367, and pendent jurisdiction over the state

causes of action relating to unfair competition and trademark pursuant 28 U.S.C. §1338(b).

19.     The Court has personal jurisdiction over the parties, and venue in this action is proper in the United States District Court for the Southern District of Texas, McAllen Division under 28 U.S.C. §§ 1391(b) and (c) and 28 U.S.C. §1446, because the Counter-Defendants reside in this District, transact affairs in this District, sued SER-CA in state court in this District, and a substantial part of the events or omissions giving rise to the claims occurred in this District.

## I.    Introduction

20.     SER-CA files this civil action against Plaintiff/Counter-Defendants TIERRA CALIENTE MUSIC GROUP, S.A. DE C.V. d/b/a Remex Music ("Tierra Caliente") and Midas Musical, Inc. ("Midas") (collectively "Counter-Defendants"), and Third-Party Defendants JOHN DOES 1-10 ("John Does 1-10" or "Third-Party"), invoking the assistance of the court and jury because the Counter-Defendants, through their owners, officers and agents and John Does 1-10, chose to ignore fundamental business and legal ethics and, through unscrupulous business transactions, have calculated and acted to deprive the Counter-Plaintiff of its legal rights and rightful interests under the Copyright Act, as well as interfered with and prevented the proper administration of Counter-Plaintiff's existing contracts, all in violation of federal and state law. SER-CA seeks to: (i) temporarily and permanently enjoin acts of statutory trademark infringement under the Lanham Act, violations of trademark infringement under the laws of the State of Texas, as

well as their unjust enrichment, interference with its business and contractual relations and prospective economic advantage, unfair competition and misappropriation; and (ii) recover damages, profits, treble damages or profits, disgorgement, attorney's fees, and costs.

## II.    Background Facts Common to All Counts

21.    SER-CA is a Texas record label and event promoter. SER-CA has operated as the exclusive rights holder for the Songs of *La Leyenda* in the United States, and is the legal and/or beneficial owner of its copyrights.

22.    On or about February 15, 2012, *La Leyenda* entered into a written Exclusivity and Assignment of Rights Agreement (the "Recording Agreement"), with Discos y Cintas SERCA, S.A. de C.V. ("SERCA MEXICO"), a Mexican record company. Before that, *La Leyenda* had entered into a similar recording agreement with SERCA MEXICO on September 13, 2007, and similar recording agreements since at least 2003, wherein *La Leyenda* agreed*, inter alia,* to "exclusively assign the totality of the rights of their artistic performances for their recording in phonograms, video-grams, DVD, live recordings, or any other technical medium…" (hereinafter the Sound Recording Rights") so that these recordings could be commercialized by SERCA MEXICO and its assignees.

23.    Under the Sound Recording Rights granted in these recording agreements, *La Leyenda* also granted to SERCA MEXICO "a permanent, irrevocable, and free license" to use *La Leyenda*'s "ARTISTIC NAME, brands, copy rights, reservation of rights, logos, and any other property right that could be needed or convenient to use the ARTISTIC

NAME" (hereinafter the "Ancillary Rights"). Of course, the Counter-Defendants were aware or should have been aware of these contracts at all relevant times.

24.     As part of the Sound Recording Rights in the Recording Agreement and previous recording agreements, *La Leyenda* granted SERCA MEXICO, or whomever it designated, the rights to, *inter alia,* exclusively use, record, present, distribute, commercialize, reproduce, transmit in all media, adapt, compile or modify *La Leyenda*'s recordings and SERCA MEXICO designated SER-CA to do so in the United States (hereinafter the "Related Rights") and conveyed the Sound Recording Rights. Ancillary Rights, and Related Rights (jointly referred to as the "Exclusive Rights"). SERCA MEXICO's contracts with *La Leyenda* have been upheld in legal proceedings and final judgments in Mexico, including the Mexican Final Judgment and the Mexican Amparo Judgment, which render without merit the Counter-Defendants' affirmative defenses, including the defenses of unclean hands and that the contracts are "fraudulent, illegal, unenforceable, or in violation of public policy." Accordingly, the Counter-Plaintiff's Exclusive Rights are equal to those in the Recording Agreement, including the exclusive rights to distribute, commercialize and sell *La Leyenda*'s sound recordings in the United States.

25.     Counter-Plaintiff exercises its contract rights and Exclusive Rights in and to *La Leyenda*'s sound recordings by facilitating the publishing, streaming, distribution, and public performance of all songs featuring *La Leyenda* (the "Songs"). Counter-Plaintiff

further exercises its Exclusive Rights to use the trademark "LA LEYENDA" (the "Mark") as a source identifier for songs featuring the performances of *La Leyenda*. Counter-Plaintiff has expended valuable time and resources to administer its Exclusive Rights for the benefit of *La Leyenda* in the United States.

26.    In addition to distributing, promoting, controlling and facilitating the use of the Songs in the United States, SER-CA retains the exclusive right to use the Mark in association with the Songs. SER-CA has expended financial resources to promote the Songs and develop income streams from their sales. In 2008, 2011, 2014 and 2015 SER-CA entered into distribution agreements with the distributor Select-O-Hits, Inc. ("SOH") and its Latin American music imprint Select-O-Hits Latino ("SOH Latino"), which the Counter-Defendants were aware of. Through SOH and other digital distributors of sound recordings, SER-CA effectuates these rights and generates physical and digital distribution income streams for the Songs in the United States. Since its first agreements with SOH and SOH Latino, SER-CA has continued to execute similar contracts with SOH, SOH Latino, and, through, SOH other digital distributors.

27.    As shown in the Plaintiffs' Complaint, the Counter-Defendants are seeking a free ride off the back of SER-CA's success, the Counter-Defendants' principals, German ("German") and Domingo Chavez ("Domingo") (collectively the "Chavez Brothers"), entered into a so-called Exclusivity Agreement with *La Leyenda*'s Eliseo Robles on August 27, 2015. The Chavez Brothers in turn assigned their global rights to Tierra Caliente and

USA rights to Midas, companies which they own and control. Pursuant to this wrongful agreement, Midas then falsely represented its ownership of the Songs. SER-CA believes that the Chavez Brothers and Counter-Defendant Midas were fully cognizant of the on-going relationship and distribution agreements between SER-CA, SOH, and SOH Latino and their digital music distributors. Pursuant to these illegal distribution agreements, the Counter-Defendants are siphoning royalty streams for the Songs which belong to SER-CA, using Songs owned by SER-CA.

28.   When SER-CA first became aware of the Counter-Defendants' wrongful activities in 2017, SER-CA was a party to at least two valid and subsisting agreements with SOH and SOH Latino. The first, executed between SOH Latino and SER-CA on or about July 29, 2014, designated SOH Latino as the exclusive distributor of the Songs in the United States (the "2014 Distribution Agreement"). The second, executed between SOH and SER-CA on or about September 9, 2015, designated SOH as the exclusive distributor of the Songs on the Internet streaming service "YouTube.com," ("YouTube") throughout the world (the "2015 Streaming Agreement").

29.   In violation of the Copyright Act and their common law duties, the Counter-Defendants aided and abetted by their long-time Mexican attorneys, which were also used as a conduit to mask their actions, conspired with *La Leyenda*, their Mexican attorneys, and others to usurp SER-CA's rights and interests under its agreement with SERCA Mexico, SOH, and digital distributors an divert the income that SER-CA received from the

distribution of *La Leyenda*'s sound recordings. SER-CA is informed and believes and based thereon alleges that, among other brazen conduct, the Counter-Plaintiffs have concealed illegal agreements deliberately designed to destroy, circumvent and/or dilute SER-CA's interests.

30.     When SER-CA was informed that copies of the Songs being posted to streaming services like YouTube, SER-CA was required to begin a game of legal "whack-a-mole," thereby attempting to protect its business and contractual interests and prevent the unauthorized distribution of the Songs by third-parties. However, for every one of the Songs taken down, a new one was posted.

31.     On March 29, 2017, a representative of the Telemundo Network ("Telemundo") responded to SER-CA's removal of one of the Songs from YouTube. The representative claimed that use of the Song on the Telemundo program "Al Rojo Vivo" was authorized by a representative of *La Leyenda*. On March 31, 2017, SER-CA received a copy of the purported written authorization. The authorization, dated March 30, 2017, and executed in San Antonio, Texas, was signed by Victor German Chavez Pérez ("German") of Counter-Defendant Midas Musical, Inc., who held himself to Telemundo as capable of granting legal rights to use the Song in Telemundo's programming. SER-CA notified Telemundo that the authorization was, in fact, no authorization at all, and the YouTube video featuring the Song was promptly removed.

32.     Counter-Defendants falsely represent to others, as they do in their Complaint,

that they are the exclusive owners and/or licensees of *La Leyenda*'s songs in the United States and have also filed counter notifications under the DMCA that material or activity (songs and video-grams) were removed or disabled by mistake or misidentification, thereby frustrating Counter-Plaintiff's contracts and diverting money that properly belongs to Counter-Plaintiff. Counter-Defendants further intentionally create confusion in the market—for both consumer-purchasers of the Songs and corporate entities seeking to use the songs for commercial purposes—by claiming ownership and/or exercising control over the Mark.

33.    Decisive Court intervention is needed to annul the Counter-Defendant's illegal agreements and prevent the Counter-Defendants from destroying SER-CA's valuable contractual interests and its state common law right to the proceeds derived therefrom. As a matter of last resort, Counter-Plaintiff seeks a declaration that Counter-Plaintiff is the sole administrator of the Songs; an injunction to prevent Counter-Defendants for continuing to exercise control over the Songs and the Mark; and recovery of damages resulting from Counter-Defendants' illegal claims of ownership of both the Songs and the Mark.

### III.   CAUSES OF ACTION

### COUNT 1
### Declaratory Judgment

34.    Counter-Plaintiff alleges and incorporates by reference the allegations set forth in paragraphs 1 through 33 as if fully set forth herein.

35.   Through its contractual relationships, SER-CA is the exclusive owner, licensee, administrator and/or authorized representative for the administration of the Songs and the Exclusive Rights in the United States. SER-CA has exercised these Exclusive Rights through contracts with third-parties like *La Leyenda*, SOH, SOH Latino, and internet distributors.

36.   *La Leyenda* was prohibited from transferring any portion of the Exclusive Rights pursuant to its contract with SERCA MEXICO, which the Counter-Defendants were fully aware of. However, Counter-Defendants have represented to third-parties that they are the exclusive owners of the Songs, or that they have the right to license the songs for publication, performance, display, reproduction, digital transmission, or distribution. This representation is in direct conflict with SER-CA's Exclusive Rights.

37.   By reason of the foregoing, an actual and justifiable controversy has arisen and now exists between SER-CA and Counter-Defendants in that SER-CA contends and the Counter-Defendants deny that the Counter-Defendants' agreements for *La Leyenda*'s services, copyrights, and trademark rights are void and unenforceable, including as a violation of the Copyright Act. In fact, all of the Counter-Defendants' agreements with the Chavez Brothers, *La Leyenda* for *La Leyenda*'s services in the entertainment business are void *ab initio* and unenforceable as they directly or indirectly are in violation of and prohibited by, *La Leyenda*'s agreements with SERCA MEXICO and SER-CA's Exclusive

Rights, which forbid *La Leyenda* to wrongfully traffic in the rights previously given to SERCA MEXICO and SER-CA.

38.    A justiciable conflict exists between SER-CA and Counter-Defendants. Specifically, a conflict exists as to whether SER-CA, as the owner, exclusive licensee, administrator, and/or authorized representative for the administration of the Songs and the Exclusive Rights, and the *La Leyenda* sound recording catalog or the Counter-Defendants have the exclusive right to distribute them in the United States during the relevant time period.

39.    A declaration of this Court is warranted under the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*., to establish the parties' respective rights and obligations with respect to their rights to *La Leyenda*'s Songs and professional services. This declaration should establish that the Counter-Defendants' purported agreements for *La Leyenda*'s sound recordings and services are void and unenforceable as a matter of law and public policy. The declaration should further establish that any agreement by the Counter-Defendants is void, unenforceable and prohibited as a matter of law and public policy.

40.    A judicial declaration is necessary and appropriate under 18 U.S.C. § 2201 that: (1) SER-CA owns and/or has the Exclusive Rights to the copyrights to the master sound recordings of the Songs in the United States; (2) that the Counter-Defendants have no copyright ownership or administration rights in the master sound recordings of the Songs; (3) any copyright registrations by Counter-Defendants to SER-CA's Songs are

invalid; and (4) that  any contract entered into by Counter-Defendants predicated on these fabricated rights to the Songs are null and void.

41.     SER-CA is entitled to an injunction, enjoining Counter-Defendants, their officers, agents and employees, and all persons acting in concert with them, from entering into or performing any agreement which directly or indirectly conflicts with SER-CA's interests with respect to *La Leyenda*'s sound recordings and the Exclusive Rights, including any agreement.

## COUNT 2
## Tortious Interference with SER-CA's Contracts and Prospective Economic Advantage

42.     Counter-Plaintiff alleges and incorporates by reference the allegations set forth in paragraphs 1 through 41 as if fully set forth herein.

43.     Through SERCA MEXICO, Counter-Plaintiff had multiple exclusive contracts and contractual rights with and/or pertaining to *La Leyenda*, including all of its members, as well as SERCA MEXICO, SOH and SOH Latino for the distribution of the Songs featuring *La Leyenda*. SER-CA has developed economic relationships including not only SOH and other music distributors, but also radio and television stations, venues, and booking agents, and others in the entertainment business. These contracts and business relationships remain valid and subsisting as of the date of this action and during the time of Counter-Defendants' interference.

44.     Counter-Defendants knew, had reason to know, and/or had knowledge of Counter-Plaintiff's contracts with SERCA MEXICO, *La Leyenda*, SOH and SOH Latino, internet distributors, and other third-parties in the music business, Counter-Plaintiff's interest in the contracts, Counter-Plaintiff's rights to enter into the contracts, or had knowledge of facts and circumstances that would lead a reasonable person to believe that there were contracts and agreements in which SER-CA had an interest. However, based on information and belief and the Plaintiffs' Complaint, SER-CA is informed and believes and based thereon alleges that to further their wrongful objectives, Counter-Defendants portrayed SER-CA in a negative, adversarial light to *La Leyenda* and such third-parties. Counter-Defendants also willfully, intentionally and/or reckless disregard for SER-CA's rights interfered with SER-CA's contracts and agreements, including the Recording Agreement and the SOH agreements including, but not limited to, the 2011 Agreement and the 2015 Streaming Agreement, authorizing the distribution and streaming of the Songs, including at least one of the Songs called "Cositas Malas" on a Telemundo program titled "Al Rojo Vivo." The Counter-Defendants also filed false counter- notifications under the DMCA, and in violation of17 U.S.C. §512(f), in the furtherance of their wrongful actions.

45.     By their wrongful conduct, the Counter-Defendants intended to hinder performance or disrupt SER-CA's relationships in order to divert SER-CA's economic interests in *La Leyenda* to the Counter-Defendants. The Counter-Defendants knew that, by their conduct, disruption of SER-CA's business relationships was certain or substantially

certain to occur and, as intended, the Counter-Defendants' conduct has disrupted SER-CA's relationships with such third-parties. Counter-Defendants' conduct alleged herein was intentional and/or reckless disregard for SER-CA's Exclusive Rights and was engaged in for the purpose of depriving SER-CA of property or legal rights or to otherwise cause injury; was despicable conduct committed with conscious disregard for SER-CA's rights; and was carried out intentionally and with reckless disregard of Ser-Ca's rights.

46.     Counter-Defendants' interference proximately caused injury and damages to SER-CA, which resulted in damages, including a loss in digital streaming royalty income, income from the required synchronization license to combine the music with video programming, and SER-CA's loss of control of the Songs in an amount to be adjudicated at trial, plus prejudgment interest. Because the Counter-Defendants' actions are intentional, for the purpose of depriving Counter-Plaintiffs of property or legal rights or to otherwise cause injury, committed in conscious disregard of Counter-Plaintiff's rights and malice, SER-CA is also entitled to recover exemplary or punitive damages in an amount according to the proof at trial.

## COUNT 3
## Misappropriation

47.     Counter-Plaintiff alleges and incorporates by reference the allegations set forth in paragraphs 1 through 46 as if fully set forth herein.

48.     The acts of the Counter-Defendants complained of above constitute misappropriation in violation of the laws of the State of Texas and proximately resulted in damages to Counter-Plaintiff.

## COUNT 4
### Unfair Competition in Violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(A)

49.     Counter-Plaintiff alleges and incorporates by reference the allegations set forth in paragraphs 1 through 48 as if fully set forth herein.

50.     Counter-Defendants' unauthorized use of the *La Leyenda* Mark, trade name, and trade dress, falsely indicates to consumers that *La Leyenda*'s entertainment services originate from, are approved by, are sponsored by, are licensed by, or are affiliated with SER-CA or are otherwise with SER-CA's entertainment services and sound recordings. The Mark is entitled to strong protection under Section 43(a) of the Lanham Act because the Mark, when used to identify entertainment services and sound recordings is "arbitrary" to such services and because SER-CA has extensively promoted the Mark to the public.

51.     The Counter-Defendants' actions amount to unfair competition which is likely to cause confusion, mistake, or to deceive the public into believing that the Counter-Defendants' goods and services originate from or are associated with SER-CA. The Counter-Defendants are passing-off SER-CA's Songs as their own. Counter-Defendants' fraudulent and/or negligent representation to third-parties of its ownership of the Songs, which are owned by Counter-Plaintiff, or otherwise its agency to administer or authorize

their use, was intended to mislead the public and lead to confusion and mistake as to the source, affiliation, or sponsorship of the Songs. Counter-Defendants' wrongful actions in entering into an unlawful agreement for the exclusive distribution of *La Leyenda*'s Songs while SER-CA's contracts were in full force and effect, authorizing the use of the Songs owned by and administered by Counter-Plaintiff in the United States, and the Counter-Defendants' improper exercise of control over the Mark in commerce is likely to confuse consumers, resulting in damage to the reputation of the Counter-Plaintiff as well as actual damages in the amounts lost through the Counter-Defendants' own sales of Counter-Plaintiff's goods.

52.    The Counter-Defendants' actions constitute trademark, trade name, and trade dress infringement in violation of Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a). The Counter-Defendants are therefore liable for the remedies provided for in 15 U.S.C §1114(2) and §§ 1116-1118, inclusive, including but not limited to, actual damages, the disgorgement of all income, benefits, and profits. The Counter-Defendants' continued and unauthorized activities have been intentional and willful, constituting an exceptional case under Section 35 of the Lanham Act, 15 U.S.C. §1117 and SER-CA is entitled to recover three times the amount of: (1) the Counter-Defendants' profits; and (2) SER-CA's actual damages, including pre-judgment interest. SER-CA is further entitled to recover its attorney's fees and costs incurred in this action.

53.   The Counter-Defendants have caused and will continue to cause Counter-Plaintiff irreparable harm. Unless restrained and enjoined by this Court, Counter-Defendants will persist in their conduct, thereby causing Counter-Plaintiff further irreparable harm for which Counter-Plaintiff has no adequate remedy at law.

## COUNT 5
## Common Law Unfair Competition

54.   Counter-Plaintiff alleges and incorporates by reference the allegations set forth in paragraphs 1 through 53 as if fully set forth herein.

55.   The Counter-Defendants have unfairly competed with SER-CA by their commercial conduct surrounding their use of a trademark, service mark, and/or trade name that is confusingly similar, if not identical, with SER-CA's trademark rights, thereby violating the common law of the State of Texas. The Counter-Defendants' use was intended to mislead the public and lead to confusion and mistake and pass of services as those of SER-CA. The Counter-Defendants' continued unauthorized use of the Mark constitutes trademark and trade name infringement in violation of the common law of Texas. The Counter-Defendants are clearly using the Mark to sell music, the same type of product sold by SER-CA, and Counter-Defendants are passing off the Songs as authorized by SER-CA and unfairly benefitting from the many years of promotional work by SER-CA on behalf of *La Leyenda,* all of which have caused damages to SER-CA in an amount to be proved at trial.

## COUNT 6
## Common Law Trademark Infringement

56.     Counter-Plaintiff alleges and incorporates by reference the allegations set forth in paragraphs 1 through 55 as if fully set forth herein.

57.     The Counter-Defendants for trademark infringement arising under the laws of the State of Texas. The acts of the Counter-Defendants complained of herein, also constitute infringement of SER-CA's common law trademark rights and have caused and will continue to cause damage to SER-CA in an amount to be proved at trial, as well as irreparable injury to SER-CA.

58.     The acts of the Counter-Defendants complained of herein by infringing the trademark rights of SER-CA, have been committed intentionally, willfully, deliberately, in reckless disregard for SER-CA's rights, and/or with the malicious intent of injuring SER-CA and damaged SER-CA.

## COUNT 7
## Violation of the Digital Millennium Copyright Act

59.     Counter-Plaintiff alleges and incorporates by reference the allegations set forth in paragraphs 1 through 58 as if fully set forth herein.

60.     The Counter-Defendants have knowingly materially misrepresented or caused to be materially misrepresented under oath that material or activity was removed or disabled by mistake or misidentification in violation of the Digital Millennium Copyright

Act, 17 U.S.C. §512(f) and (g), resulting in actual damages to SER-CA, costs, and attorneys

fees in an amount to be proved at trial.

## COUNT 8
## Accounting

61.    Counter-Plaintiff alleges and incorporates by reference the allegations set

forth in paragraphs 1 through 60 as if fully set forth herein.

62.    Under state common law, SER-CA is also entitled to an order requiring the

Counter-Defendants, jointly and severally, to render an accounting to ascertain the amount

of such proceeds as it has wrongfully obtained from its agreements for *La Leyenda*'s sound

recordings and services. The Counter-Defendants' conduct is contrary to honest practice

in commercial matters and violates Texas common law on unjust enrichment,

misappropriation, unfair competition, and interference with SER-CA's business relations,

contracts, and prospective economic advantage. The Counter-Defendants are directly or

indirectly and/or through any corporation, entity, division, or devise passing off their goods

or services as those of SER-CA by virtue of a substantial similarity between the two.

63.    SER-CA is informed and believes and, on that basis, alleges that Counter-

Defendants have engaged in additional undisclosed and as-yet-undiscovered transactions

and agreements regarding the valuable interests in *La Leyenda*'s sound recordings, Songs,

and services by which Counter-Defendants have been compensated.

64.    SER-CA is entitled to an order requiring Counter-Defendants to account to

SER-CA with respect to all compensation or proceeds paid or payable to Counter-

Defendants with respect to *La Leyenda*'s sound recordings, Songs, and services, and for an order requiring Counter-Defendants to provide to SER-CA their complete, detailed books and records of account concerning *La Leyenda*.

## COUNT 9
## Unjust Enrichment

65.    Counter-Plaintiff alleges and incorporates by reference the allegations set forth in paragraphs 1 through 64 as if fully set forth herein.

66.    SER-CA is informed and believes and based thereon alleges that, as described herein, the Counter-Defendants, in their dealings with third parties, members of the public, and SER-CA, have engaged in unlawful and unfair conduct toward SER-CA's rights under state common law with respect to *La Leyenda*'s recordings and the Songs, including deceptive and unfair practices to deceive SER-CA out of its rights in *La Leyenda*'s sound recordings.

67.    This count is asserted against the Counter-Defendants for the disgorgement and restitution of all income, gains, compensation, profits, royalties, and advantages obtained, received, or to be received by the Counter-Defendants arising from their wrongful conduct and exploitation of SER-CA's rights to *La Leyenda*'s sound recordings and the Songs achieved through their unlawful agreements with *La Leyenda*, Counter-Defendants' owners, and each other.

68.    As a direct and proximate result of the Counter-Defendants' conduct, acts, and omissions as alleged herein, SER-CA has been damaged, and the Counter-Defendants

have been and will continue to be unjustly enriched, in an amount that will be assessed at trial for which restitution and/or disgorgement is appropriate. Such should include a declaration by this Court that the Counter-Defendants' agreements with their owners and *La Leyenda* are null and void and that the Counter-Defendants are constructive trustees for the benefit of SER-CA and an order that the Counter-Defendants disgorge all income from their wrongful business dealings with *La Leyenda*, including all funds by which the Counter-Defendants have been unjustly enriched, and convey to SER-CA any and all proceeds from the compensation due to SER-CA, in an amount to be adjudicated at trial, plus prejudgment interest.

69.     The Counter-Defendants' unauthorized use and distribution of *La Leyenda*'s sound recordings, songs, and personal services has caused and will continue to cause Counter-Plaintiff irreparable harm. The Counter-Defendants' acts, and omissions have proximately caused and will continue to cause SER-CA substantial injury and damage including, without limitation, diminution in the value of SER-CA's interests in the Songs. The harm that the Counter-Defendants' conduct will cause to SER-CA is both imminent and irreparable, and the amount of damage sustained by SER-CA will be difficult to ascertain if such wrongful conduct is allowed to continue unabated and without restraint. Counter-Defendants' wrongful conduct.

70.     SER-CA has no adequate remedy at law with respect to the Counter-Defendants' ongoing unlawful conduct.  Unless restrained and enjoined by this Court,

Counter-Defendants will persist in its conduct, thereby causing Counter-Plaintiff further irreparable harm for which Counter-Plaintiff has no adequate remedy at law.

## COUNT 10
## DAMAGES

71.     Counter-Plaintiff alleges and incorporates by reference the allegations set forth in paragraphs 1 through 70 as if fully set forth herein.

72.     As a direct and proximate result of Counter-Defendants' conduct, acts, and omissions alleged herein, Counter-Plaintiff is entitled to damages, restitution of the income, gains, compensation, profits, and advantages obtained, received, or to be received by Counter-Defendants arising from their exploitation of any rights in the Songs, Sound Recording Rights and related rights, and services of *La Leyenda* achieved through their wrongful actions. Counter-Plaintiff is further entitled to an order requiring Counter-Defendants, jointly and severally, to render an accounting to ascertain the amount of such proceeds.

73.     As a direct and proximate result of Counter-Defendants' wrongful conduct, acts, and omissions alleged herein, Counter-Plaintiff has been damaged, and Counter-Defendants have been and will continue to be unjustly enriched, in an amount that shall be assessed at trial for which restitution and/or restitutionary disgorgement is appropriate. Such should include a declaration by this Court that Counter-Defendants are jointly and severally the constructive trustee(s) for the benefit of Counter-Plaintiff and an order that

Counter-Defendants convey to Counter-Plaintiff its respective share of any and all proceeds from the Songs and professional services of *La Leyenda*.

74.    Counter-Defendants' wrongful conduct, acts, and omissions have proximately caused and will continue to cause Counter-Plaintiff substantial injury and damage including, without limitation, diminution in the value of Counter-Plaintiff's interests in the Songs, Sound Recording Rights and related rights, a loss in digital streaming royalty income, income from the required synchronization license to combine the music with video programming, SER-CA's loss of control of the Songs, as well as all applicable statutory damages.  Counter-Plaintiff is also entitled to the disgorgement of all income, benefits, and profits received by the Counter-Defendants as a result of its wrongful actions.

75.    Because the Counter-Defendants' actions are intentional, for the purpose of depriving Counter-Plaintiff of property or legal rights or to otherwise cause injury, committed in conscious disregard of Counter-Plaintiff's rights and malice, SER-CA is also entitled to recover exemplary or punitive damages in an amount according to the proof at trial in order to deter the Counter=Defendants from similar wrongdoing in the future.

76.    The harm that Counter-Defendants' willful conduct will cause to Counter-Plaintiff is both imminent and irreparable, and the amount of damage sustained by Counter-Plaintiff will be difficult to ascertain if such wrongful conduct is allowed to continue unabated and without restraint.

## COUNT 11
## Application for Temporary and Permanent Injunction

77.     Counter-Plaintiff alleges and incorporates by reference the allegations set forth in paragraphs 1 through 76 as if fully set forth herein.

78.     The Counter-Defendants' conduct as alleged hereinabove will continue unless enjoined by the Court. SER-CA has no adequate remedy at law for such continuing wrongful conduct and is suffering irreparable damages as a result of the aforesaid acts of the Counter-Defendants. Counter-Plaintiff seeks injunctive relief from the Counter-Defendants' conduct pursuant to the Lanham Act, 15 U.S.C. §1051-1141 and the laws of the State of Texas. Clear equity demands the issuance of injunctive relief. The Counter-Plaintiff has no adequate remedy at law for the injuries hereinabove described. The injuries and losses are continuing. The property and rights involved are unique and irreplaceable, so that it will be impossible to accurately measure, in monetary terms, the damages caused by the Counter-Defendants' conduct.

79.     It is essential that this Court immediately and temporarily restrain the Counter-Defendants from continuing with the conduct described in this Complaint. It is also essential that the Court act immediately, because the Counter-Defendants, if left unrestrained, will continue to:

(a)     wrongfully exercise dominion and control over the Songs that it does not own by publishing, displaying, performing, reproducing, transmitting, distributing,

or allowing others to publish, display, perform, reproduce, transmit, or distribute the Songs;

(b) accept or receive payments for the Counter-Defendants' exploitation or its wrongful authorization of third-party exploitation of the Songs it does not own through physical, digital, streaming, and synchronization of the Songs;

(c) wrongfully exercise dominion and control over the trademark "LA LEYENDA" in connection with the Songs in commerce;

(d) engage in further interference with SER-CA's business relationships, contracts, and prospective economic relationships herein alleged; and

(e) cause a miscarriage of justice.

80.    In order to preserve the status quo, and the property rights of SER-CA during the pendency of this action, Counter-Defendants should be cited to appear and show cause why they should not be temporarily enjoined during the pendency of this action from wrongfully authorizing the exploitation of the Songs; wrongfully identifying itself as the owner of the Songs; accepting payment from third-parties for exploitation of the Songs; contracting with third-parties for the further exploitation or administration of the Songs in violation of SER-CA's rights; wrongfully exercising control over the Mark in commerce; and causing a miscarriage of justice.

## IV.   JURY DEMAND

81.   Counter-Plaintiff asserts its right to a trial by jury, under Texas Constitution Article 1, Section 15, and tenders the required fee with this Petition.

## V.   CONDITIONS PRECEDENT

82.   All conditions precedent to Counter-Plaintiff's right to recover in this suit have been performed or have occurred.

## VI.   PRAYER AND RELIEF REQUESTED

WHEREFORE, PREMISES CONSIDERED, Defendant/Counter-Plaintiff SER-CA DISCOS, INC. requests that Plaintiffs/Counter-Defendants TIERRA CALIENTE MUSIC GROUP, S.A. DE C.V. d/b/a Remex Music's and Midas Musical, Inc.'s claims against SER-CA be dismissed and that they take nothing by their claims; that on final trial judgment be entered in favor of SER-CA and against Counter-Defendants and Third-Party Defendant JOHN DOES 1-10, as follows:

(a)   Judgment against Counter-Defendants and Third-Party Defendant for the relief hereinabove requested;

(b)   A declaration that Counter-Plaintiff is the exclusive owner of the Songs;

(c)   A temporary injunction and permanent injunction prohibiting Counter-Defendants and Third-Party Defendant from exercising dominion and control over the Songs;

(d)  A declaration that the contracts entered into by Counter-Defendants and Third-party Defendant on the basis that Counter-Defendants are the exclusive owner of the Songs are null and void;

(e)  Reasonable attorney's fees;

(f)  Pre-judgment and post-judgment interest at the highest legal rate;

(g)  Costs of suit; and

(h)  Such other and further relief to which Counter-Plaintiff may be justly entitled.

Respectfully submitted,
By: /s/ Yocel Alonso
Yocel Alonso
ALONSO, PLLC
State Bar No. 01109100
S.D. Tex. Id. No. 3325
130 Industrial Blvd., Suite 110
P.O. Box 45
Sugar Land, Texas 77487-0045
Tel.: (281) 240-1492
Email:  Yocel@AlonsoLaw.com
**ATTORNEY FOR DEFENDANT/COUNTER-PLAINTIFF SER-CA DISCOS, INC.**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this response was served in accordance with the Federal Rules of Civil Procedure and by electronic transmission to all registered ECF users appearing in the case on January 8, 2021 as follows:

Raymond L. Thomas
RAY THOMAS, PC
4900-B North 10th Street
McAllen, Texas 78504
Tel: (956) 632-5033
Fax: (956) 630-5199
Email: rthomas@raythomaspc.com
**ATTORNEY FOR PLAINTIFF/COUNTER-
DEFENDANTS TIERRA CALIENTE MUSIC
GROUP, S.A. DE C.V. D/B/A REMEX MUSIC
and MIDAS MUSICAL, INC.**

     /s/Yocel Alonso

     Yocel Alonso

# EXHIBIT A

# CERTIFICATION OF TRANSLATION

I, Elena Vega, declare under penalty of perjury that I understand the Spanish language and the English language; that I am a professional translator, certified by the American Translators Association (ATA, certification number 518170), a voting member of the same organization, a member of the Houston Interpreters and Translators Association (HITA), a member of the Texas Association of Healthcare Interpreters and Translators (TAHIT), a Certified Healthcare Interpreter (by the Certification Commission of Healthcare Interpreters), and a Master Licensed Court Interpreter (by the Judicial Branch Certification Commission of the State of Texas, License No. 2017); and that, to the best of my knowledge and belief, the statements in the English language in the attached translation of the file:

- **JUDGMENT ON DIRECT AMPARO 740/2017/3**

translated by Norma G. Cavazos, and that I have duly stamped and signed in the back of each page, has the exact same meanings as the statements in the original file in the Spanish language, a copy of which I have carefully reviewed.

I also state that this is verbatim translation of the document, and therefore it might contain grammatical and/or syntax errors that are present in the original documents in Spanish.

Translators Signature _____

Signed in the City of __Houston, TX__ on __August 21, 2018__ .

Notary Public _____



JORGE R. CANTU
Notary Public, State of Texas
Comm. Expires 04-11-2021
Notary ID 6629366

Elena Vega
2717 Wroxton, Houston, TX 77005
832-265-456
elenavega@yahoo.com
ATA member: 259080

Traducción Oficial

FORM A-55

On the left hand side a seal that reads UNITED MEXICAN STATES. FEDERAL JUDICIARY.

DIRECT AMPARO[1]: 740/2017/3

**COMPLAINANTS:** ELISEO ROBLES GUTIERREZ, MANOLO ROBLES PEREZ, ISRAEL GUTIERREZ LEIJA AND ARISTIDES GUSTAVO CARCANO FLORES.

**SPEAKER JUDGE:** EDGAR HUMBERTO MUNOZ GRAJALES
**COURT CLERK:** NAPOLEON NEVAREZ TREVINO.

Monterrey, Nuevo Leon. Writ issued by the Third Civil Federal Collegiate Court of the Fourth Circuit corresponding to the regular session of June six, two thousand eighteen.

HAVING REVIEWED AND CONSIDERED for final resolution, the proceedings of the

Direct Amparo Trial 740/2017/3, and

### THEREFORE

**FIRST. Amparo Suit.** By means of a brief filed on November twenty four, two thousand seventeen, before the Filling Office of the Superior Court of the State, **Eliseo Robles Gutierrez, Manolo Perez, Israel Gutierrez Leija and Aristides Gustavo Carcaño Flores**, through their attorney in fact for collections and litigations Luis Fernando Morales Rizzi, filed a direct Amparo suit for the violation of articles 14 and 16 of the Political Constitution of the United Mexican States, against the authority and for the following act:

"*III, RESPONSIBLE AUTHORITIES. Acting in such capacity is the Magistrate of the First Civil Chamber of the Superior Court of the State*, addressed at his/her own official location.

DOCUMENTO TRADUCIDO
C.P. Norma G. Cavazos F
Perito Traductor Oficial
Official Translator
TRANSLATED DOCUMENT

---

[1] TRANSLATOR'S NOTE: Amparo trial: called Juicio de Amparo or Juicio de Garantías as is a native Mexican legal institution. It is a constitutional remedy to obtain relief against violation of constitutional civil rights committed by the government or by a court of law. Its purposes are: to preserve the rights and freedoms granted by the Federal Constitution to private persons against executive, legislative and court acts and to preserve Federal, State and local sovereignty in interstate or Federal-State disputes. Relief applies only to the petitioner and the decision serves only as a reference for subsequent cases (and does not have the same force and effect as precedent does under US law or British law). There are 2 types of Amparo trial proceedings: (i) Amparo Indirecto (Indirect Amparo trial) tried before Federal District Courts against Federal, State or municipal laws, against regulations issued by the Federal or State Executive branches, against acts of authority committed by Federal, State or municipal government agencies; and (ii) Amparo Directo (Direct Amparo trial), which is tried before Federal Collegiate Circuit Courts against final court decisions that violate the Constitution. In both types of Amparo, the government act is contested (acto reclamado) may be subject to a provisional suspension, which is a temporary injunction, upon the filing of the petition, and a permanent injunction (suspension definitiva) may be issued after a hearing where evidence and legal arguments are presented. The judgment is always directed to the government or court authorities in question and not to the individuals and business or corporate or civil entities which are parties to the proceedings.

*IV.- CONTESTED ACT: Final judgment issued on October thirty first (31st), two thousand seventeen (2017) by the Magistrate of the First Civil Court of the Superior Court of Justice of the State of Nuevo Leon, within the records of the Final Appeal case number 275/2017, made with the Appeals filed by the concerned third party and the complainants, against the final judgment dated September four (4), two thousand seventeen (2017), issued by the Sixth Judge of Concurrent Jurisdiction of the First Judicial District in the State of Nuevo Leon, within the records of file number 1030/2015, relevant to an Ordinary Mercantile Proceeding filed by the concerned third party against Eliseo Robles Gutierrez, Manolo Robles Perez, Israel Gutierrez Leija, Aristides, Gustavo Carcaño Flores et al. In the same manner, all considerations of facts, merits, and equity or otherwise derived from the judgment that constitutes a contested act and execution thereof that are materially prejudicial to the complainants are contested herein.*"

**SECOND. Contested act.** The judgment rendered on October thirty first two thousand seventeen, by the magistrate of the First Civil Chamber of the Superior Court of Justice of the State of Nuevo Leon, within appeal case number 275/2017, derived from the judicial file 1030/2015, concluded with the following resolution points:

"*I. The study of the appeals filed individually by Discos y Cintas Serca, Sociedad Anónima de Capital Variable through its attorney in fact for collection and litigation, Servando Angel Cano Resendez and its co-defendants Eliseo Robles Gutierrez, Israel Gutierrez Leija, Manolo Robles Perez and Aristides Gustavo Carcaño Flores, through their attorney in fact for collection and litigation, Luis Fernando Morales Rizzi, has merits.*

*Ordinary defense methods filed against the final judgment rendered September four, two thousand seventeen, rendered by the Sixth Judge of Concurrent Jurisdiction of the First Judicial District in the State.*

*Although grievances proposed in the appeal filed by the defendants are inoperative. In the other hand, one of the grievances proposed by the plaintiff has merits, but the rest of them have not.*

*II. The appealed resolution is modified, in resolution item 3.3 to become as follows:*

**OOCUMENTO TRADUCIDO**
**C.P. Norma G. Cavazos F.**
**Perito Traductor Oficial**
**Official Translator**
**TRANSLATED DOCUMENT**

Traducción Oficial

*3.3. Defendants are condemned to forcefully comply with the agreement of assignment of rights and exclusivity over the artistic interpretation dated February fifteen two thousand eleven, which translates into the following: Defendants must record for Discos y Cintas Serca, Sociedad Anónima de Capital Variable, two new and unreleased albums with a minimum of ten musical selections that are unreleased, already released or covers (Recordings) each one of the phonograms. This according to what was agreed in the sixth clause of the agreement that is the base of this action, and under the guidelines, form and terms agreed in such clause.*

*III. It is hereby determined that each one of the parties takes charge of the costs and expenses incurred by each one of them caused by their appeals.*

*Notify in person... "*

**THIRD. Date of the delivery of the justified report, lawsuit, summons and service of process, files and appeal case number.** By writ 1612/2017, dated December four, two thousand seventeen, received by this collegiate court that same day, the magistrate of the First Civil Chamber of the Superior Court of Justice in the State, rendered the justified report and attached thereto, among other things, the original and copies of the Amparo lawsuit in question, and the evidence of the summons served to the concerned third party.

**FOURTH. Amparo suit process.** By writ dated **December seven, two thousand seventeen,** the magistrate president of this collegiate body, admitted the Amparo lawsuit, ordered the registration thereof and the creation of file number 740/2017/3, directed the intervention of the Federal District Attorney ascribed therein; which DA made no objection, determining that the concerned third party Discos y Cintas Serca, Sociedad Anónima de Capital Variable was served and summoned.

**FIFTH. Turn.** By writ dated **February eight, two thousand eighteen,** the file was turned to magistrate Edgar Humberto Muñoz Grajales, to make corresponding judgment project.

DOCUMENTO TRADUCIDO
C.P. Norma G. Cavazos F
Perito Traductor Oficial
Official Translator
TRANSLATED DOCUMENT

Traducción Oficial

# WHEREAS

**FIRST. Competency.** This Third Civil Collegiate Court of the Fourth Circuit is competent to review this matter, based upon the provisions of article 107 fraction V, clause c) of the Mexican Constitution concordant with articles 34, 170, 171, and 172 of the Amparo Law as well as 37, fraction I, clause c), and 144 of the Organic Law of the Federal Judiciary and the general order 3/2013 of the Full Bench of the Federal Judicature Board; due to the contestation of a final judgment rendered in a proceeding of a mercantile nature, in respect of which no other recourse is valid and the ordering court issuing the same resides within the territorial circumscription of this collegiate court.

**SECOND. Existence of the contested act.** It is true that the contested act of the magistrate of the First Civil Chamber of the Superior Court of Justice of the State, as it was communicated by the same through the justified report by writ 1612/2017 dated December four, two thousand seventeen, corroborated with appeal case number 275/2017, dispatching an attachment containing the contested judgment therein.

**THIRD. Opportunity of the lawsuit.** The amparo lawsuit was filed within the fifteen-day term provided by Article 17 of the Amparo Law pursuant to the following:

a)     The contested judgment was served by a writ addressed to the complainants **on November second two thousand seventeen to become effective on the next day, November third,** under the provisions of Article 1075 of the Commerce Code.

b)     The fifteen-day term to file the Amparo suit against the contested judgment ran from **November six, two thousand seventeen** exclusive of days **eleven, twelve, eighteen, nineteen, twenty, twenty five and twenty six of the same month and year** because those days were Saturdays, Sundays and holidays according to articles 19 of the Amparo Law and 163 of the Organic Law of the Federal Judiciary.

c)     Therefore, the Amparo suit was filed on time on **November twenty four, two thousand seventeen.**

ne foregoing, may be graphically observed in the following schedule.

DOCUMENTO TRADUCIDO
C.P. Norma G. Cavazos F.
?erito Traductor Oficial
Official Translator
TRANSLATED DOCUMENT

Traducción Oficial

| NOVEMBER 2017 | | | | | | |
|---|---|---|---|---|---|---|
| MONDAY | TUESDAY | WEDNESDAY | THURSDAY | FRIDAY | SATURDAY | SUNDAY |
| | | | 2 a) | 3 | 4 | 5 |
| 6 b) | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 e) | 25 | 26 |
| 27 f) | | | | | | |

a) Date in which the contested suit was served.
b) Date from which the term started to run.
c) [    ] Fifteen-day term to file the Amparo suit.
d) [▆▆] Non-working days.
e) Date in which the Amparo lawsuit was filed.
f) Date in which the term expired.

**FOURTH. Omission of transcription.** Neither the considerations sustaining the contested judgment nor the violating concepts expressed in the Amparo lawsuit are transcribed herein, because there is not a legal provision compelling to include the same in the judgment, in fact Article 74 of the Amparo Law does not provide for such instance, but it imposes the duty to resolve all questions that are effectively presented therein and on the other hand, the files include the violation concepts and the certified copy of the contested act.

The following jurisprudence applies as follows:

*"VIOLATION CONCEPTS OR GRIEVANCES. TO COMPLY WITH THE PRINCIPLES OF CONSISTENCY AND COMPLETENESS IN THE AMPARO JUDGEMENTS IS UNNECESSARY THE TRANSCRIPTION THEREOF. From the precepts integrating chapter X "Regarding judgments", of title first "General Rules", book first "Regarding the Amparo in general", the Amparo Law does not impose upon the judge the obligation to transcribe the breached concepts, or in its case, the grievances, to comply with the principles of consistency and completeness in the judgments. because such principles are satisfied when the judge states the issues subject to debate arising from the Amparo lawsuit of from the motion to express grievances. and when the judge reviews and answers the same. which answer must be linked and correspond to the legality or constitutionality questions effectively presented in the corresponding plea without introducing aspects other than the ones*



DOCUMENTO TRADUCIDO
C ·P. orrna G. Cavazos F.
Pento Traductor *Oficial*
Official Translator
TRANSLATED DOCUMENT

Traducción Oficial

*included in the Litis. However, there is no prohibition to make such transcription either, being left to the prudent discretion of the judge whether to make it or not, considering the special particularities of each case, without forgetting that in order to satisfy the principles of consistency and completeness, the legality or unconstitutionality questions that were effectively enforced therein are reviewed[2].*

**FIFTH.** From the issues provided by this case we can see that the constitutional *litis* is centered upon establishing if the amendment of a contract produces or not the annulment thereof, as well as the terms and obligations which the parties submitted to for the compliance of such contract.

First, in order to establish whether **the amendment of the contract produces the annulment thereof or not,** it is important to outline that the formality of the juridical acts consist of the submission to the manifestation of the private will to forms predetermined by law which are classified as: *ad solemnitatem* and *ad probationem.*

As per authors Guillermo Ospina Fernandez and Eduardo Ospina Acosta, in their book named Teoria General de los Actos o Negocios Juridicos (General Theory of the Juridical Acts or Business), publisher Temis, third edition, Bogota, Colombia, one thousand nineteen eighty seven, pages two hundred thirty five to two hundred thirty seven; formalisms *ad solemnitatem and ad probationem* consist of:

"a) *AD SOLEMN/TATEM FORMALISM Theatrically it consists of, whether in the definite negotiation of the juridical power of the private will, or in the declaration of their insufficiency as a source of juridical effects. If the first is true, the formalism presents in its most acute side which is the one of the symbolism, corresponding to archaic legislations and featured by the attribution of all the juridical efficiency to the sole observance of the rituals and solemnity prescribed by the law. In the symbolism, the will does not count, the form is everything (forma dat esse rei). If the second is true, the formalism keeps its modern aspect, according to which the solemnity is barely a complement of the will: it is the means necessary for this, true substance of the juridical acts, to be accounted for by the law.*

*Practically, the ad solemnitatem formalism, in its two previous levels, consists always on the restriction of the means to express the private will, indicating absolute forms, aside of which is shall be*

---

[2] Opinion 58/2010., of the Second Chamber of the Supreme Court of Justice of the Nation, published in the Federal Judicial Weekly and Gazette thereof. Ninth Edition, Volume XXXI, May 2010. Page 830.

**DOCUMENTO TRADUCIDO**
C.P. Norma G. Cavazos F.
Perito Traductor Oficial
**Official Translator**
**TRANSLATED DOCUMENT**

*deemed as not expressed, alleged as non-existent. Therefore, we may define the solemn act along with Ihering, saying that "it is the one in which the lack of observance of the juridical form affects the act itself".*

*To finish the profiles of the notion on the ad solemnitatem formalism we must state that the restriction implied by it as per the means to express the will it always has to be positive, this is, it must consist in the indication of the determined and absolute forms which lack of compliance affects the same existence of the respective act. Therefore, it is improper to talk about ad solemnitatem formalism referring to certain specific negative restriction regarding freedom to choose such means, like when the acceptance of an offer per the silence of its addressee is not admitted because in such case the agent is free to choose other authorized means, like the granting of a written document, verbal manifestation, etc. This negative restrictions, no doubt, reveal certain juridical interventionism in the exertion of the private will, but they do not constitute the enforcement of ad solemnitatem formalism in any way that the acts intervened in such manner may perfectly and validly form out of such restrictions.*

*b) AD PROBATIONEM FORMALISM It coincides with the foregoing as both assume the positive restriction of the expression of the will, this is, the indication of determined juridical forms to which such expression must conform to, and as per both seek for the same ends, which are to secure the precision, clarity and conservation of the juridical acts. But probationem formalism differs mainly from ad solemnitatem formalism where the first does not affect or touches the formation or perfection the respective acts, but only judicially. The ad probationem formal act is born perfect and valid, notwithstanding the prescribed legal form; only that the lack of compliance of this form makes it difficult and sometimes it may fully impede the judicial demonstration of the same. We may, then, define the formal ad probationem act saying that it is the one in which the omission of the juridical form only affects the evidence of the act. "*

From the foregoing we can see that the ad solemnitatem formalism must be understood as those requisites set forth by the law are compellingly satisfied if the juridical act is to be deemed existent.

In such regard, *ad probationem* formalism must be understood as the requisites of the juridical act which omission does not affect the existence thereof, but only in the evidence of its existence; this is, in the manner of judicially accrediting the same.

DOCUMENTO TRADUCIDO
C.P. Norma G. Cavazos F
Perito Traductor Oficial
Official Translator
TRANSLATED DOCUMENT

Traducción Oficial

Due to the foregoing, one can conclude that the lack of ad solemnitatem formalities causes the annulment of the juridical act, whether for inexistence of the will of the one performing it or whether for the inability to become effective due to the lack of satisfaction of all the requisites compelled by law.

In this manner, the lack of the ad probationem formality shall not cause the annulment of the juridical act, because this only affects or disturbs the demonstration of such acts before the respective judicial authority and, within this assumption, the lack of formality may be cured within a judicial dispute.

It is important to mention that the consideration relevant to whether a formalism should be considered ad solemnitatem or ad probationem is obtained from the provisions of the substantive articles applicable to each case, because each law provides which are the indispensable formalisms for the existence of the acts and which ones affect only the manner of accrediting them judicially; and therefore, they are curable by turning to a judicial dispute.

The previous comes from the provisions of the abovementioned doctrine, in the law referred in the previous paragraphs, by establishing the following:

*"LACK OF COMPLIANCE OF THE FULL SOLEMN FORM: The law does not limit itself to indicate that the diverse solemnities prescribed by certain juridical acts, but it also rules, ordinarily to the last detail, the elements and details integrating the same. Therefore, a delicate question arises to that respect: having observed at least in essence, the pertinent legal solemnity, but not in full, due to the omission of some of its own details, which is the situation of the respective act?, shall it be inexistent?, or shall it be null and void?, or shall it validly exist? An example will clarify the problem: a public will and testament or nuncupative has been granted by a public deed before a notary public, as it is provided by law; but sum requisites of such solemnity have been predetermined, like the signature of one of the witnesses to the granting. The question is: for this last reason, the testament does not exist? Or shall it be null? Or by the contrary, does it validly exist?*

*In first place, we must observe that this comes from the assumption that the legal solemnity has been complied with, or at list in essence, because if not so, the problem is already resolved: the will of the agents has not been manifested by the only means authorized by the law, and consequently, the juridical act is deemed inexistent. In our example, the public deed is, by legal definition, an instrument*

DOCUMENTO TRADUCIDO
C.P. Norma G. Cavazos F.
Perito Traductor Oficial
Official Translator
TRANSLATED DOCUMENT

Traducción Oficial

granted before a notary public, or before the one acting as such, and incorporated into the respective notarial record (article 1758); then if the will has not been granted before a notary public or someone acting as such, such solemnity named public deed lacks, and consequently, the same act submitted thereto does not exist either.

Once this fundamental issue has been stated, one must add that the proper answer to the questions made herein depends of the important that the law attributes to each one of the requisites demanded as components of the respective solemnities. First, one can say that all requisites or ad solemnitatem formalities must be complied with, under the penalty that the respective acts are vitiated, because we must assume that the law has demanded the same, complicating therefore the exertion of the autonomy of the will, inspired in the same criteria of safety and social interest that has taken the same to consecrate the institution of the solemn acts. However, this criterion is not and may not be absolute, because it is also possible that some of the form legal requisites look for the most clarity of the juridical acts or something similar to it, without the omission adversely affecting the high social interest linked to the solemnity institution considered together. In such case, the same law must take charge, as it effectively does, to state that the lack of compliance of such requisites shall not prejudice the existence of or the validity of the respective acts. "(Page two hundred and forty three and two hundred and forty four of the same book mentioned above).

To conclude, the formalities whether of existence (*ad solemnitatem*) or only of probative efficiency (*ad probationem*) must be contained expressly in de applicable law in each case, and only the lack of *ad solemnitatem* formalities may cause the nullity of the juridical for inexistence and lack of the *ad probationem* formality it only affects the evidencing of the act before the judicial authority and that for that reason its failure or omission may be cured in a trial.

The formalities in question must contain or be observed when the act is performed, this is, when the will is expressed and once fulfilled, said act shall become effective upon all the parties therein; on the contrary, failure to comply with one or both of them shall cause the absolute or relative nullity thereof, as the case may be.

In this particular case, only the lack of compliance with the *ad solemnitatem* formalities causes the act to be null and void, pursuant to article 1795 of the Federal Civil Code; the legal incapacity of the

DOCUMENTO TRAOUCIDO
C.P. Norma G. Cavazos F
Perito Traductor Oficial
Official Translator
TRANSLATED DOCUMENT

Traducción Oficial

parties or of one of them; vices of consent; because its purpose or object is illegal; or because the consent has not been manifested in the manner established by law.

Now, from the proceedings we are able to observe that it was accredited the amendment to the contract as of the date of subscription and comparing it to the resolution of the responsible authority, the complainants assume that this amendment would cause the decree of the annulment of the contract due to the existence of a vice of consent.

To wit, there is a vice of consent of the parties when one of them makes the other believe or acts under false pretenses about the nature of the business; the identity of the purpose; the essence of the thing, or of such party's property; the temporality; or the individuality of the person regarding his or her singular qualities; which elements are a determination of the will.

In that regard, it is true that when inducing one of the contracting parties to have a false belief with respect to the temporality of a contract *-time during which the contracting parties shall be constrained to comply with the terms of the contract, will all the rights and obligations agreed therein-* may cause the existence of a vice of consent, it is also true that such event, shall require proof, this is, regarding the justification that the parties did not bind themselves within the terms and for the time they wanted to do so, because otherwise we cannot talk about nullity due to a vice of consent.

Consequently, even though in proceedings the amendment of the date of subscription was demonstrated, that was not enough to prove the existence of a vice of consent of the contracting parties, sufficient to declare the annulment of the contract but it required to prove that the it was due to false pretenses or a deceptive purpose from one of the contracting parties.

Now, in this case, aside from the existence or not of the evidence with respect to the foregoing, complainants may not look for the nullity of a contract for the amendment of the of subscription and therefore, the duration thereof, if at the end they acknowledge the same and obtained benefits for the duration thereof

To strengthen the foregoing, we must outline that the doctrine and compared jurisprudence (mainly Spain, Germany, Colombia, and Argentina) derived from the good faith principle have created institutions such as .antisocial exercise of the law (expressly regulated in the Constitution of Spain), the

OOCUMENTO TRADUCIDO
C.P. Norma G. Cavazos F.
Perito Traductor Oficiai
Official Translator
TRANSLATED DOCUMENT

Traducción Oficial

disloyal delay in the exercise of the rights, the appearance doctrine, the doctrine of our own acts and some others. For this case, we are interested in this last doctrine only.

The rule deriving from the Latin legal axiom (brocardus)[2] *venire contra factum propiu, nu/la cocedítur,* or doctrine of our own acts (or of respect of our own acts) is based upon the inadmissibility of a litigant to base a posture invoking facts contravening his or her own affirmations or assuming an attitude which places litigant in opposition to such person's previous demeanor[3].

The grounds for it lays in the trust created in another subject in good faith, due to his or her first behavior, which would be broken if it would be admissible to accept and consent to a later and contradictory pretense.

This is a limit to the exercise of rights that, in other circumstances lay be unlawfully exercised.

As it is indicated by Lopez Meza[4], *"The inadmissibility of going against our own acts technically constitutes a limit to exercise a subjective right or of an authority derived from the good faith principle and particularly, form the demand to observe, within the juridical traffic, a coherent behavior."*

The Ninth Chamber of the Guardianship of the Constitutional Court of Colombia[5] understands this doctrine as follows:

*"9. The fundamental right to due process includes, as it was indicated by this Corporation, not only the guarantees of article 29 of the Constitution but also some other cumulus of values and principles of the same constitutional tenor that make it go beyond the compliance of the requisites that the procedural law imposes (legal due process) through the unrestricted compliance of the other rights allowing the effectiveness of a fair order. Within those values and principles, to the judgment of the*

---

[2] From the Latin brocardus. It is a ruling, a legal axiom, usually written in Latin that expresses briefly an evident rule.

[3] LOPEZ MEZA, Marcelo J, op. Quote, p. 89

[4] Idem, p, 90

[5] Judgement T-204 of March four, two thousand four. File T-736650. This resolution is relevant for the resolution of this amparo trial because a similar case was reviewed. In fact, it was indicated therein that the Bank, when sending the plaintiff the list of payments made during the year two thousand and when concluding that the balance of the mortgage at December 31 of that same year was $0.00 pesos, it assumed a concrete juridical position before plaintiff's mortgage debt, notifying plaintiff so, with which the Bank created an expectation about the state of the mortgage owed to it, making the plaintiff believe that the credit was absolutely cancelled. Therefore, it was concluded that even that no release was issued by the defendant (this is, the document accrediting the total payment of the credit), the conduct of the Bank clearly showed that the obligation was fully canceled based upon the information provided by the Bank.

**DOCUMENTO TRADUCIDO**
**C.P. Norma G. Cavazos F.**
**Perito Traductor Oficial**
**Official Translator**
**TRANSLATED DOCUMENT**

*Court, it is especially relevant for the analysis of the juridical problem presented herein, the respect of our own acts-*

*10.  principle of respecting our own acts operates when a legal subject has performed an act that has generated a particular, concrete and, defined situation in favor of another. Such principle prevents such subject to modify unilaterally its own decision, because the trust of the recipient was not generated by the conviction of the appearance of legality of some act, but for the assurances of having obtained a defined juridical position through an act that created particular and concrete situations in favor of such subject.*

Therefrom it is derived that the respect of our own acts include a limit to the exertion of rights that consists in the loyalty of the individuals with the decisions taken by the same, not being able to revoke the same on their own, furthermore, when the later act is based upon unreasonable, disproportionate or extemporaneous criteria."

The doctrine in question is not a synonym for a deprivation of a subjective right since it does not imply the extinction thereof, but only as it was indicated before, a limitation to its exertion to protect the interest of the person who put its trust in the previous behavior of the one exercising such right.

To simplify things, the legal axiom analyzed herein is an application of the principle of trust in the juridical traffic and not a specific bad faith or lying prohibition.

Even though doctrine and jurisprudence of each country has outlined individually the assumptions and requisites applying to this theory, there is a consensus indicating that these are basically: a) a binding and efficient behavior, b) a latter and contradictory behavior affecting the expectation derived from the previous one, and c) the juridical identity of the acting subjects in both situations.

It is not an absolute rule. No rigid, automatic application of the rule is admitted, because each case must be assessed.

It is a residual application doctrine, for when no specific rule exists for the particular case. This is, the application of the doctrine does not apply when the law regulates an express solution for the contradictory conduct, permitting or impeding it.



DOCUMENTO TRADUCIDO
C.P. Norma G. Cavazos F.
Perito Traductor Oficial
Official Translator
TRANSLATED DOCUMENT

It shouldn't be applied when it is unnecessary or unfounded. The application of such maxim requires a strict juridical control to avoid any excess in the application of the theory.

It is applied with respect to judicial and extrajudicial behaviors.

This doctrine requires the existence of a process to apply the rule. Regarding this need, Diez-Picazo6 indicated that *"for our jurisprudence the application of the rule that prevents us from going against our own acts assumes always a procedural situation (... ) it is during the process whereby me cannot go against our own acts."*

The fact that this doctrine has an exclusive application within a jurisdictional process does not mean that the act intended to be contradicted occurred within the process, because there is no inconvenient that the same comes from another place, but we only require one process to invoke the violation of the consistency obligation as a defense generally.

Its application does not require the existence of an express rule, since it comes from the good faith principle.

It may and it must be applied *ex-officio* by the judge.

Several courts and authors have considered that this doctrine may be applied *ex-officio* by the judges and courts through the *ira curia novit principle*.

It is possible to fall in contradiction when formulating an action or an exception, the position having in the process is indifferent.

The doctrine of our own acts may be used by any of the parties whether acting in an active or passive manner, because it is not an exception in a strict procedural sense, but a general defense.

The fundamental effect provoked by the application of such doctrine is the irrelevance of the contradictory behavior with a previous act, this is, that the later contradictory act is not taken into account,

---

[6] DIEZ-PICAZO PONCE DE LEON, Luis, The doctrine of own acts: a critical study regarding the Supreme Court jurisprudence, Barcelona, 1963, pp. 188 and ss. And 193.

**DOCUMENTO TRADUCCION**
**C.P. Norma G. Cavazos F.**
**Perito Traductor Oficial**
**Official Translator**
TRANSLATED DOCUMENT

  
Traducción Oficial

and the first manifestation is the one that prevails. To put it in simpler words, the sanction is disregarding the contradictory act.

From the previous consideration the following jurisprudence criterion derived:[7]

***OWN ACTS DOCTRINE. IMEDIATE AND DIRECT DERIVATION FROM THE GOOD FAITH PRINCIPLE.*** *Good faith is defined as the belief of one person that he or she is acting conforming to the law; it constitutes a general principle of law, consisting of an honest, diligent, correct behavior demanding from the any person under the law a loyalty and honesty excluding all malicious intent. It is the inspiring base of the legal system, and thus, it possesses an absolute scope irradiating its influence in all the spheres, in all the situations, and in all the juridical relations. Then, as of this principle, the doctrine and jurisprudence have derived diverse situations, among which, due to their importance for the resolution of juridical problems the one called doctrine of theory of our own acts outstands, since it derives from the rule consigned in this legal axiom: "venire contra jactum propium, nulla conceditur ", which is based upon the inadmissibility for a litigant to base his or her posture invoking facts contradicting such litigant's own affirmations or assuming an attitude that places the litigant opposed to his or her previous behavior and it is based upon the good faith trust created in the other subject, caused by the first behavior thereof, which good faith would be broken if it were admissible to accept and take into account the later and contradictory intention."*

Therefore, taking into account the previously expressed reasoning, it is inadmissible to accept and take into account the intention of the complainant if at the end, they acknowledged the subscription of the agreement and benefited from it during the time it was effective. It is outlined, due to what was expressed herein and to the behavior of the parties, that the annulment of the contract may not be declared, because it would imply ignoring the time during which the contractual relationship between the parties remained; that before the lack of certainty and objection of the complainants.

---

[7] Edition: Tenth Edition. Record: 2001905. Instance: Circuit Collegiate Court. Type of Opinion: Single. Source: Federal Judicial Weekly and its Gazette. Book XIII, October 2012, Volume 4. Opinion: 1.30.C.6 K (1O a.) Page: 2517.

DOCUMENTO TRADUCI O
C.P. Norma G. Cavazos F.
Perito Traductor Oficial
Official Translator
TRANSLATED DOCUMENT

Traducción Oficial

Then, in the contradictory part, it was resolved that such event - *date of subscription and therefore, duration of the contract- was accredited with expert proof introduced in the trial and with the motions relevant to an investigation file inherent to a complaint filed by the complainants; evidence with which it was concluded that the contract was subscribed in two thousand eleven and not in two thousand ten, as it was indicated by the complainants. Now, since no controversy exists regarding the expiration in question* -the complainants, in the Amparo suit, refer to the amendment as a cause for annulment, but not due to the contracts not being subscribed in two thousand eleven, nor they disputed the expert opinions of the preliminary inquiry- it must be confirmed and therefore, the date of subscription of the contract shall be two thousand eleven.

Additionally, notwithstanding the date of subscription, and thus, the duration of the contract, the temporality of the same was not conditioned to a fixed date by the parties, regarding clause sixth of the agreement whereby it was agreed that *"the contract shall be extended, notwithstanding the date of expiration thereof... until the time the artist satisfactorily complies, before SERCA, all obligations stipulated in the contract".* This is, at the time the contract was subscribed and acknowledged by the parties, the complainants were bounded to comply with what was agreed therein, for example, with recording five new and unreleased albums, as well as a record recorded live, so even if the expiration date was what the complainant pretended, such fact did not released complainants to carry out the obligations in question.

Finally, as of the **terms and obligations to which the parties were subject for the compliance of the contract,** we must need the contents of the same, for what is relevant, the parties agreed to the following:

## SIXTH.- RECORDINGS:

"THE ARTIST" binds to record, during the term of this contract:

(i)     5 (FIVE) new and unreleased ALBUMS with a minimum of 10 MUSICAL SELECTIONS, that are unreleased, already released or covers (Recordings).

(ii)    1 (ONE) Record recorded live to be edited with a CD and a DVD which shall contain at least 10 ten MUSICAL SELECTIONS.

DOCUMENTO TRADUCIDO
C.P. Norma G. Cavazos R.
Perito Traductor Oficial
Official Translator
TRANSLATED DOCUMENT

Traducción Oficial

The parties agree that **"SERCA",** to its discretion and based upon the results of the previous ALBUMS shall determine the additional recording of 2 (two) CONCEPT RECORDS, by "THE ARTIST", which records shall include at least 10 (ten) to 15 (fifteen) MUSICAL SELECTIONS. Understanding both parties that the CONCEPT RECORDS shall not be considered under any circumstance as NEW RECORDINGS, and they shall not generate in favor of "THE ARTIST" any type of copy right or royalty.

"THE ARTIST" binds to appear at the place, time, and date previously indicated by "SERCA", previous notice thereof with at least seventy two hours before the recording of the MUSICAL SELECTIONS takes place, which shall be technologically and commercially satisfactory to the discretion of "SERCA". "THE ARTIST" shall appear on time and shall perform his work with due care and professionalism, as well as in his full physical and intellectual capacity, being understood that it shall be the direct responsibility of "THE ARTIST" any damages caused by the non- compliance of this clause.

"SERCA" shall have the exclusive authority to determine the date in which the ALBUMS shall be launched whether while the AGREEMENT (or any extension thereof, if any) is in full force and effect or after the expiration or termination thereof, notwithstanding the date of recording of each one of the PHONOGRAMS, this without causing the diminishing, impairing or elimination of the exclusive rights of "SERCA" or the granting of additional rights to "THE ARTIST".

In case THE ARTIST fails to comply with the obligations of interpretation and recording of the MUSICAL COMPOSITIONS, contained in this clause, the agreement shall be deemed as extended, notwithstanding the date of termination of this agreement stipulated in Clause Thirteenth, except "SERCA" decides anything to the contrary, until the time "THE ARTIST" complies to the satisfaction of "SERCA" with all the obligations stipulated in the CONTRACT.

"SERCA" reserves the right to establish, record, produce, reproduce, import, distribute, adapt, compile, and publish de MUSICAL SELECTIONS, VIDEOS, DVDs, DUAL DISC, LIVE RECORDINGS or any other technological mean known now or to be developed in the future, in

**DOCUMENTO TRADUCIDO**
C.P. Norma G. Cavazos F
Perito Traductor Oficial
**Official Translator**
**TRANSLATED DOCUMENT**

Traducción Oficial

compilations, collections or other modalities and marketing thereof, that include the MUSICAL SELECTIONS of "THE ARTIST" which MUSICAL SELECTIONS shall not be considered as NEW AND UNRELEASED ALBUMS.

Now, in order to deduce which was the will of the parties, it is important to denote that as per the interpretation of the contracts, author Federico N. Videla Escalada indicates in his book named "The interpretation of Civil Contracts" edited by Arboledo-Perrot, juridical monographies, pages 64 to 97, reading the following:

*"... a) FINDING THE COMMON INTENTION OF THE PARTIES.*

*Within the most synthetic and essential manner, this rule may be expressed saying that above the literal sense, one should look for the common intention of the parties.*

*The fundamental issue to elucidate about this basic rule is the distinction between the common intention of the contracting parties and the individual intention of each one of them.*

It is very important, in fact, to determine what they had in mind both parties when they agreed to the contract, what was their pretenses, which were their presented and clarified objectives, and it must be disregarded, on the other hand, what they thought they were going to obtain as a consequence of the act.

Therefore, this rule riches very deep into the interpretation process, because it tends to investigate the true will of the contracting parties at the time of performing the agreement, which effect shall only compute what they expressed in words or in fact during the negotiations or by their behavior thereafter.

This search of the actual will of the parties is essential and it makes it indispensable to outline that the concretion of the agreement shows that their reciprocal intentions had found a mean to conciliate in the contract.

**DOCUMENTO TRADUCIDO**
C.P. Norma G. Cavazos F.
**Perito Traductor Oficial**
**Official Translator**
**TRANSLATED DOCUMENT**

Traducción Oficial

*Regarding this, it is destined to make clear the actual will, it cannot be surpassed - it shall never be excessive to insist in this aspect- something very important: we do not care for the sole internal will, but for the statement made by such will.*

A comprehensive expression of this rule may take us to the following enunciation, the words used in the contract must be understood in the common and general context, except that the parties clarify that they wanted to attribute another special meaning thereof"

"*d) THE CONSIDERATION OF THE CONTRACT AS A WHOLE.*

This rule, picked-up from section 2nd of article 218 of our Commerce Code, article 1161 of the French Code and 1363 of the Italian one, may be read as follows: the different clauses of a contract must be interpreted in a consistent manner, ones by means of the others, considering the contract as a whole, which content, spirit and sense is one.

The logic of the precept appears very clear, because if one intends to interpret one clause alone individually, extracting the same from the whole contract context and taking its meaning in an isolated manner, the result may be ambiguous and it shall not reflect the common intention or the actual will of the parties.

On the contrary, when the existence of an organic whole is acknowledged and when it is accepted as an integral entity, like a system with an end for itself, the sense of each one of its clauses shall not emerge from its redaction only but it shall relate to the features and elements of such organic integral whole.

And it is common that a clause that alone lacks indispensable clarity and does not offer a pristine content or reveals the common intention of the contracting parties, changes its aspect and becomes clear when it is linked with the rest of them and starts playing within the body of the juridical act integrating the same.

DOCUMENTO TRADUCIDO
C.P. Norma G. Cavazos F.
Perito Traductor Oficial
Official Translator
TRANSLATED DOCUMENT

<u>Traducción Oficial</u>

*The foregoing shows the usefulness presented always by this rule to the jurisprudence, since it has served to resolve problems of extreme complexity."*

*"h) THE INTEGRATING INTERPRETATION*

The contract must be considered integrated to the complementary and supplemental clauses integrating the social uses.

One can affirm that while the integration tends to fill the spaces existing in the convention, the mere integrating interpretation remains in the territory of the contract and intends to resolve the consequences that implicitly are englobed in it, understanding as an objective expression in the general juridical regulation".

It is convenient to point out also that the mentioned above author shows that for the effects of the authentic interpretation it should be taken into account the behavior that the contracting parties had observed after the agreement was closed, because many times it is very useful to specify the intention of the contracting parties, consider the following approaches, conversation and proposals that took place before the final agreement was closed, which information constitute precise data that help the one interpreting the same to get a clear idea of the purpose guiding such parties.

Doctrine teaches that three general forms of contracts interpretation have been set forth; to wit: a) the common inquiry of parties' intention; b) considering contracts as an integral whole; and c) the integrating interpretation of contracts.

The first form of interpretation intends to discover the common intention of the parties when carrying out a contractual agreement when it contains clauses that apparently contradictory; the second, rises over the base that for a contract clause to be understood in a consistent manner it must be interpreted through the others; in this one the contract is considered as an integral whole which content, spirit, and sense is one.

DOCUMENTO TRADUCIDO
C.P. Norma G. Cavazos F.
Perito Traductor Oficial
Official Translator
TRANSLATED DOCUMENT

Traducción Oficial

It is important to mention that this last manner of interpretation implies a review regarding the clauses or the content thereof, contained in the contractual covenants.

Lastly, the integrating interpretation implies an analysis not only of the covenants but also of the social uses and the parties' behaviors carried out both to create the contract as after the subscription of the same, to discover the intention of the parties intervening therein.

In such manner, the union of what was stated by the parties in clause sixth of the contract, allows us to conclude that the intention of the contracting parties was that the artist (complainants) would record five new and unreleased albums with a minimum of ten musical selections, that were unreleased, already released or covers, as well as a live record. Also, that "SERCA"—concerned third party—reserved for itself the right, among other things, to compile and publish musical selections that would include the artist's musical selections which selections, as it was indicated therein, would not the considered as new and unreleased albums.

For this case, it was mentioned the existence of four albums and one live record, which fact leads to conclude, in first place -*without arising any controversy to that effect*- that at least one of the albums to which the complainants were obliged to make was pending to be recorded, because the latter bound to record five new and unreleased albums, with at least ten musical selections, whether unreleased, already released, or covers, as well as one live record and we insist that from the five only four were accounted for and the live record. Therefore, the terms of the contract were not complied with and due to that, the punishment imposed on the judgment in question must subsist, at this time, over the recording of one of the albums.

Now, the problem presents itself in one of the four recorded albums to be considered as new and unreleased -*the album is emphasized because the content may be satisfied with musical selections, whether unreleased, releases, or covers*-. The albums over which no controversy arose are "Más fuerte que Hercules", "La Neta Planeta", and "777", while the one adjudged as not new and unreleased is "La Leyenda, 12 Gran Exitos".



DOCUMENTO TRADUCIDO
C.P. Norma G. Cavazos F
Perito Traductor Oficial
Official Translator
TRANSLATED DOCUMENT

Traducción Oficial

The foregoing, was explained by the responsible authority, because "La Leyenda, 12 Gran Exitos" was a compilation made by Discos y Cintas Serca, with the authority conferred by the last paragraph of clause sixth of the contract. To boost such statements, a description was made of the twelve songs, from which eleven, as said, were released in other albums - *here, it is important to denote that if the responsible authority, in order to sustain his conclusion alluded to the Copyright Law, it was just to confirm the authorship of the albums, it was then correct the mention of such law* -while the rest- *the twelfth one*- said that even if such song was not previously released, it was not enough to resolve differently, because the albums had to have at least ten unreleased musical selections.

Now, it is true, that as the complainants mention, the content of the albums may be satisfied with musical selections that were unreleased, already released or covers, it is also true that to be considered as new and unreleased - the album- required that this musical already released musical selections did not come from the artist, since in the final part of clause sixth of the contract, it was established that the recording, reproduction, among others, of the artist would not be considered as new and unreleased artists. In other words, it is true, one new and unreleased album may be composed of songs already released or covers, but not by the artist, but by a third party.

In fact, the last paragraph of clause sixth of the contract the parties agreed that: "... *SERCA reserves the right to fix, record, reproduce. . . compile and publish the musical selections... of THE ARTIST, same which shall not be deemed as NEW AND UNRELEASED ALBUMS.* " This is already released musical selections of the artist would not be considered as new and unreleased albums.

Therefore, contrary to the opmlon of the complainant, whether if the plaintiff made the compilation of the musical selections with their consent and whether such musical selections may be already released or covers was not a determinant to conclude if they had or not a new and unreleased album, but the already released or cover musical selections were not composed by the artist, this if the claimed judgment mentioned the phonograms in which they were released at least eleven songs belonging to the artist and only one of them was unreleased, it is

DOCUMENTO TRADUCIDO
C.P. Norma G. Cavazos F.
Perito Traductor Oficial
Official Translator
i TRANSLATED DOCUMENT

incontrovertible that with such album the contract terms may not be deemed as fulfilled, because the album had had to contain ten musical selections, not previously released by the artist.

In the other hand, from the considerations presented in the contested resolution, these, contrary to what the violation concepts indicated, they meet the requisites of foundation, motivation, consistency and completeness since from its content we can see that the responsible judge mentioned the respective articles and ordinances, as well as the immediate causes for which the validity of the contract was confirmed, as well as for which the judge declared that the grievances of the appeal had merit to conclude that two albums were to be recorded with the features to which the parties bound; this, under the petition contained in the grievances - *that the album "La Leyenda, 12 Grandes Exitos" is not to be considered unreleased-* this is, without substituting the deficiency of the complaint at all, and without omitting a resolution regarding some aspect or acting outside the *litis*.

In the same manner the rights of the complainants were respected as well as the formalities to oppose exceptions and defenses, introduction of evidence and obtain a judgement whereby the requests of the parties were resolved.

This is, not only one of the albums is pending recording within the terms of the contract but two; the first, which no controversy arose from; and the other one for containing songs already released by the artist, instead of being released by a third party o unreleased *-at least ten songs were needed-*. Therefore, while the terms of the contract are not complied with, the contract shall remain in full force and effect for the parties.

Together with the analysis made before, we must point out that even though it is true that the jurisprudence 32/2018 (10 a.) approved by the Second Chamber of the Supreme Court of Justice of Mexico in private session held on March seven two thousand eighteen, established that when the parties invoke in their suit a jurisprudence, precedents, and including, isolated opinions, duly identified, the jurisdictional body must render an opinion of their applicability, whether the complainant expressed or not reasons to justify the applicability thereof, it is also true that, in this case, the one invoked by the complainants, in attention to the considerations of this sentence,



DOCUMENTO TRADUCIDO
C.P. Norma G. Cavazos F
Perito Traductor Oficial
Official Translator
TRANSLATED DOCUMENT

<u>Traducción Oficial</u>

does not benefit their case at all in order to be considered to resolve the question otherwise, because it refers to the alteration of the amount of a bill of exchange, while the alteration being enforced in the complaint was introduced but with respect to a contract and in which contract the will of the parties was demonstrated, as well as the term in which they were bound.

Lastly, we must insist that even when some of the invoked opinions interpret rules of the Amparo Law in effect until April two, two thousand thirteen, they are applicable to the case within the terms of article sixth transitory of the new Amparo Law in effect as of April three of that same year, since they do not contradict the content thereof

Under such conditions, after having disregarded the petitions of the complainants and since no hypothesis for the substitution of the complaint took place, pursuant to article 79 of the Amparo Law, the requested protection is hereby denied.

Due to the foregoing and in pursuance of articles 73, 74, 75, 76, and 77 of the Amparo Law and 35 of the Organic Law of the Federal Judiciary it is hereby

**ORDERED:**

**SOLE:** The Union Justice **does not protect or shield Eliseo Robles Gutierrez, Manolo Robles Perez, Israel Gutierrez Leija and Aristides Gustavo Carcaño Flores,** against the judgment dated October thirty first, two thousand sixteen, due to ordinary mercantile proceeding 130/2015.

**Proceed to Notify;** with the corresponding testimony return the files to the place they came from and as soon as possible file the same as a closed matter.

It was so ordered by the full bench of the Third Civil Collegiate Court of the Fourth Circuit by the unanimous votes of magistrates Pedro Pablo Hernandez Lobato (president), Edgar Humberto Muñoz Grajales (speaker judge) and magistrate Rebeca del Carmen Gomez Garza, whom within the terms of article 188 of the Amparo Law, sign the same before

**DOCUMENTO TRADUCIDO**
C.P. Norma G. Cavazos F.
**Perito Traductor Oficial**
**Official Translator**
**TRAN SLATED DOCUMENT**

Traducción Oficial

the court clerk Juanita Azucena Garcia Correa who authorized and attests, until June thirteen two thousand eighteen, date in which the files were completed.

MAGISTRATE PRESIDENT

An illegible signature

PEDRO PABLO HERNANDEZ LOBATO


SPEAKER JUDGE

An illegible signature

EDGAR HUMBERTO MUNOZ GRAJALES


MAGISTRATE

An illegible signature

REBECA DEL CARMEN GOMEZ GARZA


COURT CLERK

An illegible signature

JUANITA AZUCENA GARCIA CORREA


**DOCUMENTO TRADUCIDO**
C.P. Norma G. Cavazos F.
**Perito Traductor Oficial**
**Official Translator**
**TRANSLATED DOCUMENT**

Traducción Oficial

This page belongs to the resolution of **June 6, two thousand eighteen,** issued in direct amparo number **740/2017/3** where the protection was denied.

IN THE CITY OF MONTERREY, NUEVO LEON, **JUNE THIRTEEN TWO THOUSAND EIGHTEEN,** ON THIS DATE I RECEIVE THE OPINION RENDERED BY MAGISTRATE **EDGAR HUMBERTO MUNOZ GRAJALES,** THE FILES AND THE TESTIMONY OF THE EXECUTORY JUDGEMENT RENDERED IN THIS MATIER AND ON THE SAME DATE IT IS DELIVERED FOR PUBLICATION THEREOF. I ATTEST.

**THE COURT CLERK OF THE THIRD CIVIL COLLEGIATE COURT OF THE FOURTH CIRCUIT**

An illegible signature

**JUANITA AZUCENA GARCIA CORREA.**

**DOCUMENTO TRADUCIDO**
C.P. Norma G. Cavazos F.
**Perito Traductor Oficial**
**Official Translator**
**TRANSLATED DOCUMENT**

<u>Traducción Oficial</u>

Illegible FIRST HOUR OF PUBLIC DISPATCH THE PARTIES ARE NOTIFIED EXCEPT FOR THOSE WHO ARE ORDERED TO BE NOTIFIED IN PERSON, BY A WRIT OR VIA EMAIL THE RESOLUTION illegible ON THE GROUNDS OF ARTICLES illegible FRACTION III illegible

An illegible signature

At the City of Monterrey, Capital of the State of Nuevo Leon, the Court Clerk of the Third Civil Collegiate Court of the Fourth Circuit evidences and certifies that the previous documents illegible and originals thereof illegible <u>AD 740/17</u> are going in <u>twenty (20)</u> pages duly compared and collated, signed according to the Law, which is issued on this <u>fifteen June, two thousand eighteen</u>

Court Clerk

An illegible signature

**DOCUMENTO TRADUCIDO**
**C.P. Norma G. Cavazos F.**
**Perito Traductor Oficial**
**Official Translator**
**TRANSLATED DOCUMENT**

Traducción Oficial

I, C.P.A. Norma Gabriela Cavazos Fernandez, <u>Spanish-English</u> <u>Official Translator</u>, appointed by the Hon. Supreme Court of the State of Nuevo Leon, Mexico, CERTIFY THAT: the previous document that was given in <u>twenty-six-26</u> page(s), is a true and correct translation from <u>Spanish</u> to <u>English</u> of its preceding document, all of which I certify herein for any and all purposes thereof.

Monterrey, N.L., <u>August 7, 2018</u>

C.P.A. NORMA GABRIELA CAVAZOS FERNÁNDEZ
Official Appointment: 644/2018
Dated January 31, 2018
My Commission Expires January 31, 2019

La suscrita C.P.A. Norma Gabriela Cavazos Fernandez, <u>Perito</u> <u>Oficial en Traduccion Ingles-Espanol,</u> designada por el H. Tribunal Superior de Justicia de Nuevo Leon, CERTIFICA QUE: el documento que antecede y que consta de <u>Veintiseis-26</u> hoja(s), es una traducción fiel y correcta del idioma <u>Español</u> al <u>Ingles</u> del documento que le precede, lo que se hace constar para los efectos conducentes.

Monterrey, N.L., a <u>7 de agosto de 2018</u>

C.P.A. NORMA GABRIELA CAVAZOS FERNÁNDEZ
Nombramiento Oficial No: 644/2018
de fecha 31 de enero de 2018
Mi Nombramiento Vence el 31 de enero de 2019

DOCUMENTO TRADUCIDO
C.P. Norma G. Cavazos F
Perito Traductor Oficial
Official Translator
TRANSLATED DOCUMENT

# EXHIBIT B



PODER JUDICIAL DE LA FEDERACIÓN

**AMPARO DIRECTO:** 740/2017/3

**QUEJOSOS:** ELISEO ROBLES GUITIÉRREZ, MANOLO ROBLES PÉREZ, ISRAEL GUTIÉRREZ LEIJA Y ARÍSTIDES GUSTAVO CARCAÑO FLORES.

**MAGISTRADO PONENTE:** EDGAR HUMBERTO MUÑOZ GRAJALES
**SECRETARIO:** NAPOLEÓN NEVÁREZ TREVIÑO.

Monterrey, Nuevo León. Acuerdo del Tercer Tribunal Colegiado en Materia Civil del Cuarto Circuito, correspondiente a la sesión ordinaria del día seis de junio de dos mil dieciocho.

**V I S T O S**, para resolver en definitiva los autos del juicio de amparo directo 740/2017/3, y

**R E S U L T A N D O**

**PRIMERO. Demanda de amparo.** Mediante escrito presentado el veinticuatro de noviembre del dos mil diecisiete, ante la Oficialía de Partes Común del Tribunal Superior de Justicia del Estado, **Eliseo Robles Gutiérrez, Manolo Robles Pérez, Israel Gutiérrez Leija y Arístides Gustavo Carcaño Flores**, por conducto de su apoderado general para pleitos y cobranzas Luis Fernando Morales Rizzi, promovieron juicio de amparo directo,

- 2 -

**A.D. 740/2017/3.**

por violación de los artículos 14 y 16 de la Constitución Política de los Estados Unidos Mexicanos, en contra de la autoridad y por el acto siguiente:

"*III.- AUTORIDADES RESPONSABLES. Tienen tal carácter el C. Magistrado de la Primera Sala Civil del H. Tribunal Superior de Justicia en el Estado, con domicilio en su respectivo recinto oficial.*

*IV.- ACTO RECLAMADO: Lo constituye la sentencia definitiva pronunciada en fecha 31 (treinta y uno) de Octubre de 2017 (dos mil diecisiete) por el C. Magistrado de la Primera Sala Civil del H. Tribunal Superior de Justicia del Estado de Nuevo León, en los autos del Toca de Apelación en Definitiva número 275/2017, formado con motivo de los Recursos de Apelación interpuestos por la tercero interesado y los ahora quejosos, en contra de la sentencia definitiva de fecha 4 (cuatro) de Septiembre de 2017 (dos mil diecisiete), pronunciada por el C. Juez Sexto de Jurisdicción Concurrente del Primer Distrito Judicial en el Estado de Nuevo León, dentro de los autos del expediente número 1030/2015, relativo al Juicio Ordinario Mercantil promovido por la ahora tercero interesada en contra de los señores Eliseo Robles Gutiérrez, Manolo Robles Pérez, Israel Gutiérrez Leija, Arístides Gustavo Carcaño Flores y otro. Así mismo se reclaman todas las consecuencias de hecho, de derecho, económicas y de cualquier otro tipo que se deriven de la sentencia que constituye el acto reclamado y de su ejecución, en perjuicio de los aquí quejosos.*"

**SEGUNDO. Acto reclamado.** La sentencia dictada el treinta y uno de octubre del dos mil diecisiete, por el magistrado de la Primera Sala Civil del Tribunal Superior de Justicia del



**A.D. 740/2017/3.**

PODER JUDICIAL DE LA FEDERACIÓN

Estado, dentro del toca 275/2017, deducido del expediente judicial 1030/2015, concluyó con los siguientes puntos resolutivos:

"*I.- Es procedente el estudio de los recursos de apelación interpuestos individualmente por Discos y Cintas Serca, Sociedad Anónima de Capital Variable, por conducto de su apoderado general para pleitos y cobranzas, Servando Ángel Cano Resendez, y los codemandados, Eliseo Robles Gutiérrez, Israel Gutiérrez Leija, Manolo Robles Pérez y Arístides Gustavo Carcaño Flores, por conducto de su apoderado general para pleitos y cobranzas, Luis Fernando Morales Rizzi.*

*Medios ordinarios de defensa interpuestos contra la sentencia definitiva de cuatro de septiembre de dos mil diecisiete emitida por el Juez Sexto de Jurisdicción Concurrente del Primer Distrito Judicial del Estado.*

*Aunque inoperantes los agravios propuestos la apelación de los demandados. Por su parte, resultó fundado uno de los agravios propuestos por la actora, pero infundado el resto de ellos.*

*II.- Se modifica la resolución apelada, en su punto resolutivo 3.3, para quedar como sigue:*

*3.3. Se condena a la parte demandada al cumplimiento forzoso del contrato de cesión de derechos y exclusividad sobre interpretación artística, de fecha quince de febrero de dos mil once, lo que se traduce en lo siguiente: La parte demandada deberá de grabar para Discos y Cintas Serca, Sociedad Anónima de Capital Variable, dos álbumes nuevos e inéditos, con un mínimo de diez selecciones musicales inéditas, divulgadas o covers (Grabaciones), cada uno de los fonogramas. Esto, acorde a lo pactado en la cláusula sexta del contrato base de la acción, y bajo los lineamientos, forma y términos acordados en dicha cláusula.*

- 4 -

A.D. 740/2017/3.

*III.- Se determina que cada una de las partes deberá soportar los gastos y costas que hubiere erogado con motivo de su respectivo recurso de apelación.*

*Notifíquese personalmente...".*

**TERCERO. Fecha del envío del informe justificado, demanda, emplazamiento, expediente y toca de apelación.** Por oficio 1612/2017, de cuatro de diciembre de dos mil diecisiete, recibido en este tribunal colegiado el mismo día, el magistrado de la Primera Sala Civil del Tribunal Superior de Justicia en el Estado, rindió su informe justificado y anexó, entre otras cosas, original y copias de la demanda de amparo de que se trata y constancia de emplazamiento realizado a la tercera interesada.

**CUARTO. Trámite del juicio de amparo.** Por auto de **siete de diciembre del dos mil diecisiete,** el magistrado presidente de este órgano colegiado, admitió la demanda de amparo, ordenó su registro y la formación del expediente número 740/2017/3, dio intervención al agente del Ministerio Público de la Federación adscrito; quien no formuló pedimento y se determinó que la tercera interesada, Discos y Cintas Serca, Sociedad Anónima de Capital Variable, se encontraba emplazada.



FORMA A-55

2 4

- 5 -

**A.D. 740/2017/3.**

**PODER JUDICIAL DE LA FEDERACIÓN**

**QUINTO. Turno**. Mediante proveído de **ocho de febrero del dos mil dieciocho**, se turnó este expediente al magistrado Edgar Humberto Muñoz Grajales, para la elaboración del proyecto de sentencia respectivo.

**C O N S I D E R A N D O**

**PRIMERO. Competencia**. Este Tercer Tribunal Colegiado en Materia Civil del Cuarto Circuito es competente para conocer del presente asunto, con base en lo establecido en el artículo 107, fracción V, inciso c), de la Constitución Política de los Estados Unidos Mexicanos en concordancia con los artículos 34, 170, 171 y 172 la Ley de Amparo, así como 37, fracción I, inciso c), y 144 de la Ley Orgánica del Poder Judicial de la Federación y el acuerdo general 3/2013 del Pleno del Consejo de la Judicatura Federal, por reclamarse una sentencia definitiva dictada en un procedimiento de naturaleza mercantil, respecto de la cual no procede recurso alguno y el tribunal de alzada que la pronunció tiene su residencia en la circunscripción territorial de este tribunal colegiado.

**SEGUNDO. Existencia del acto reclamado**. Es cierto el acto reclamado del magistrado de la Primera Sala Civil del Tribunal Superior de Justicia del Estado, por así haberlo comunicado al rendir su informe justificado mediante oficio 1612/2017 de cuatro de diciembre de dos mil diecisiete, lo cual se

- 6 -

A.D. 740/2017/3.

corrobora con el  toca civil número 275/2017, que remitió anexo, donde obra la sentencia reclamada.

**TERCERO. Oportunidad de la demanda** La demanda de amparo se presentó dentro del plazo de quince días que establece el artículo 17 de la Ley de Amparo, en atención a lo siguiente:

a) La sentencia reclamada se notificó por instructivo a los quejosos el **dos de noviembre del dos mil diecisiete  y surtió efectos el tres de noviembre siguiente,** al tenor de lo dispuesto por el artículo 1075 del Código de Comercio.

b) El plazo de quince días para promover la demanda de amparo contra la sentencia reclamada transcurrió del **seis al veintisiete de noviembre de dos mil diecisiete,** con exclusión de los días **once, doce, dieciocho, diecinueve, veinte, veinticinco y veintiséis del propio mes y año** por haber sido sábados y domingos e inhábiles, conforme a los artículos 19 de la Ley de Amparo y 163 de la Ley Orgánica del Poder Judicial de la Federación.

c) Por tanto, la demanda de amparo se presentó oportunamente el **veinticuatro de noviembre de dos mil diecisiete.**

Lo anterior, se puede apreciar gráficamente en el siguiente calendario.



FORMA A-55



- 7 -

A.D. 740/2017/3.

PODER JUDICIAL DE LA FEDERACIÓN

| NOVIEMBRE 2017 | | | | | | |
|---|---|---|---|---|---|---|
| Lunes | Martes | Miércoles | Jueves | Viernes | Sábado | Domingo |
| | | | 2 a) | 3 | 4 | 5 |
| 6 b) | 7 | 8 | 9 | 10 | 11 | 12 |
| 13 | 14 | 15 | 16 | 17 | 18 | 19 |
| 20 | 21 | 22 | 23 | 24 e) | 25 | 26 |
| 27 f) | | | | | | |

**a)** Fecha en que se notificó la sentencia reclamada.

**b)** Data en que empezó a transcurrir el término.

**c)** ▓ Plazo de quince días para promover el amparo.

**d)** ■ Días inhábiles.

**e)** Fecha en que se presentó la demanda de amparo.

**f)** Data en que feneció el término.

**CUARTO. Omisión de transcripción.** No se transcriben los considerandos que sustentan la sentencia reclamada, ni los conceptos de violación expresados en la demanda de amparo, pues, por una parte, no existe disposición legal que obligue a que formalmente obren en la sentencia, inclusive, el artículo 74 de la Ley de Amparo nada dispone al respecto, aunque sí impone el deber de resolver las cuestiones efectivamente planteadas y, por otra parte, obran en el expediente los conceptos de violación y copia certificada del acto reclamado.

- 8 -

**A.D. 740/2017/3.**

Es aplicable, la jurisprudencia del siguiente contenido:

*"CONCEPTOS DE VIOLACIÓN O AGRAVIOS. PARA CUMPLIR CON LOS PRINCIPIOS DE CONGRUENCIA Y EXHAUSTIVIDAD EN LAS SENTENCIAS DE AMPARO ES INNECESARIA SU TRANSCRIPCIÓN. De los preceptos integrantes del capítulo X "De las sentencias", del título primero "Reglas generales", del libro primero "Del amparo en general", de la Ley de Amparo, no se advierte como obligación para el juzgador que transcriba los conceptos de violación o, en su caso, los agravios, para cumplir con los principios de congruencia y exhaustividad en las sentencias, pues tales principios se satisfacen cuando precisa los puntos sujetos a debate, derivados de la demanda de amparo o del escrito de expresión de agravios, los estudia y les da respuesta, la cual debe estar vinculada y corresponder a los planteamientos de legalidad o constitucionalidad efectivamente plantados en el pliego correspondiente, sin introducir aspectos distintos a los que conforman la Litis. Sin embargo, no existe prohibición para hacer tal transcripción, quedando al prudente arbitrio del juzgador realizarla o no, atendiendo a las características especiales del caso, sin demérito de que para satisfacer los principios de exhaustividad y congruencia se estudien los planteamientos de legalidad o inconstitucionalidad que efectivamente se hayan hecho valer.*[1]*"*

**QUINTO.** De lo acaecido en el contradictorio destaca que la litis constitucional se centra en establecer si la alteración de un contrato, produce o no, la nulidad de éste, así como en los

---

[1] Tesis 58/2010, de la Segunda Sala de la Suprema Corte de Justicia de la Nación, publicada en el Semanario Judicial de la Federación y su Gaceta, Novena Época, Tomo XXXI, Mayo de 2010, Página 830.



**A.D. 740/2017/3.**

PODER JUDICIAL DE LA FEDERACIÓN

términos y obligaciones a los que quedaron sometidas las partes para el cumplimiento del propio contrato.

En primer término, para establecer **si la alteración de un contrato, produce o no, la nulidad de éste**, cabe destacar que la formalidad de los actos jurídicos consiste en la sujeción de las manifestaciones de la voluntad privada a formas predeterminadas por la ley que se clasifican en: *ad solemnitatem* y *ad probationem*.

Para los autores Guillermo Ospina Fernández y Eduardo Ospina Acosta, en su obra titulada Teoría General de los Actos o Negocios Jurídicos, editorial Temis, tercera edición, Bogotá, Colombia mil novecientos ochenta y siete, páginas doscientos treinta y cinco a doscientos treinta y siete; los formalismos *ad solemnitatem* y *ad probationem* consisten en:

"*a)   EL   FORMALISMO   AD   SOLEMNITATEM.- Teóricamente consiste: o bien en la negación categórica del poder jurídico de la voluntad privada, o bien en la declaración de su insuficiencia como fuente de los efectos jurídicos. Si lo primero, el formalismo se presenta por su arista más aguda cual es la del simbolismo, propio de las legislaciones arcaicas y caracterizado por la atribución de toda la eficacia jurídica a la sola observancia de las ritualidades o solemnidades prescritas por la ley. En el simbolismo la*

**A.D. 740/2017/3.**

*voluntad no cuenta, la forma lo es todo (forma dat esse rei). Si lo segundo, el formalismo reviste su aspecto moderno, según el cual la solemnidad apenas si es un complemento de la voluntad: es el medio necesario para que esta, verdadera sustancia de los actos jurídicos, pueda ser tenida en cuenta por el derecho.*

*Prácticamente, el formalismo ad solemnitatem, en sus dos grados antedichos, consiste siempre en la restricción de los medios de expresión de la voluntad privada, mediante el señalamiento de formas absolutas, fuera de las cuales este se tiene por no manifestada, se reputa inexistente. Por tanto, bien podemos definir con Ihering el acto solemne diciendo que "es aquél en el cual la inobservancia de la forma jurídica repercute sobre el acto mismo".*

*Para terminar los perfiles de la noción del formalismo ad solemnitatem hay que declarar que la restricción que éste implica en cuanto a los medios de expresión de la voluntad siempre tiene que ser positiva, o sea, que debe consistir invariablemente en el señalamiento de formas determinadas y absolutas cuya inobservancia repercute sobre la existencia misma del acto respectivo. Por consiguiente, es impropio hablar de formalismo ad solemnitatem, refiriéndose a ciertas restricciones meramente negativas de la libertad en la escogenia de aquellos medios, como cuando no se admite la aceptación de la oferta por el silencio de su destinatario, porque en tal caso el agente es libre de elegir cualquiera otro de los medios autorizados, como el otorgamiento de un escrito, la manifestación verbal, etc. Estas restricciones negativas, a no dudarlo, revelan cierto intervencionismo jurídico en el ejercicio de*



PODER JUDICIAL DE LA FEDERACIÓN

*la voluntad privada, pero no constituyen aplicaciones del formalismo ad solemitatem, comoquiera que los actos así intervenidos pueden formarse perfecta y válidamente fuera de tales restricciones.*

*b) EL FORMALISMO AD PROBATIONEM.- Coincide con el anteriormente descrito en cuanto ambos suponen la restricción positiva de la libertad de expresión de la voluntad, o sea, el señalamiento de formas jurídicas determinadas a que dicha expresión debe amoldarse, y en cuanto ambos persiguen las mismas finalidades, cuales son el aseguramiento, la precisión, la claridad y la conservación de los actos jurídicos. Pero el formalismo ad probationem difiere fundamentalmente del formalismo ad solemnitatem, en cuanto aquél no incide o repercute en la formación y perfeccionamiento de los respectivos actos, sino únicamente en la prueba de ellos, vale decir, en la manera de acreditarlos judicialmente. El acto formal ad probationem nace perfecto y válido, independientemente de la forma legal prescrita; sólo que la inobservancia de esta forma dificulta y hasta puede impedir totalmente la demostración judicial de aquél. Podemos, pues, definir el acto formal ad probationem, diciendo que es aquel en que la omisión de la forma jurídica solamente repercute sobre la prueba del acto."*

De lo anterior se sigue, que por formalismo ad solemnitatem debe entenderse aquellos requisitos establecidos por la ley que obligadamente deben satisfacerse para que el acto jurídico pueda considerarse existente.

- 12 -

**A.D. 740/2017/3.**

Así, por formalismo *ad probationem* debe entenderse los requisitos del acto jurídico cuya omisión no afecta la existencia de éste, sino solamente en la prueba de su existencia; es decir, en la manera de acreditarlos judicialmente.

Por lo anterior, se puede concluir que la falta de formalidades *ad soleminitatem* trae consigo la nulidad del acto jurídico, ya por inexistencia de la voluntad de quien lo realiza, o bien por no poder surtir efectos al no haberse satisfecho todos los requisitos obligados por la ley.

Por su parte, la falta de formalidad *ad probationem* no puede traer consigo la nulidad del acto jurídico, dado que ésta sólo afecta o repercute en la demostración de dichos actos ante la autoridad judicial respectiva siendo así, que en este supuesto, la falta de formalidad sí puede ser subsanada en el transcurso de una controversia judicial.

Cabe precisar, que la consideración relativa a si un formalismo debe ser considerado ad solemnitatem o *ad probationem,* se obtiene del contenido de los artículos sustantivos aplicables a cada caso, pues en cada ley establecen cuáles son los formalismos indispensables para la existencia del actos y cuáles afectan únicamente a la forma de acreditarlos



PODER JUDICIAL DE LA FEDERACIÓN

judicialmente; y por ende, son subsanables al momento de acudir a alguna controversia judicial.

Lo anterior, se desprende de lo asentado por los propios doctrinarios citados, en el tratado referido en párrafos precedentes, al sostener lo siguiente:

*"LA INOBSERVANCIA DE LA PLENITUD DE LA FORMA SOLEMNE.- La ley no se limita a indicar las varias solemnidades que prescribe para ciertos actos jurídicos, sino que también reglamenta, de ordinario minuciosamente, los elementos y detalles integrantes de ellas. Suscítase, por tanto, una delicada cuestión al respecto: habiéndose observado, a lo menos en su esencia, la solemnidad legal pertinente, pero no en toda su plenitud, por haberse omitido alguno o algunos de sus detalles propios, ¿Cuál es la situación del acto respectivo? ¿Será este inexistente? ¿O será nulo? ¿O existirá válidamente?. Un ejemplo aclarará el problema: un testamento público o nuncupativo se ha otorgado por escritura ante notario, como lo manda la ley; pero se ha pretermitido algún requisito de dicha solemnidad, como la firma de uno de los testigos o del otorgante. Se pregunta aquí: por este último motivo, ¿el testamento no existe? ¿O es nulo? O, por el contrario, ¿existe válidamente?*

*En primer lugar, hay que advertir que aquí se parte del supuesto de que la solemnidad legal se ha observado, o lo menos en su esencia, porque de no ser así, el problema ya estará resuelto de*

- 14 -

**A.D. 740/2017/3.**

---

*antemano: la voluntad de los agentes no se ha manifestado por el único medio autorizado por la ley y, por tanto, el acto jurídico se reputa inexistente. En nuestro ejemplo: la escritura pública es, por definición legal, un instrumento otorgado ante notario o el que haga sus veces, e incorporado en el respectivo protocolo (art. 1758); luego, si el testamento no se ha otorgado ante un notario o quien haga sus veces, falta esencialmente esa solemnidad denominada escritura pública y, por consiguiente, tampoco existe jurídicamente el acto mismo sometido a ella.*

*Declarado este punto fundamental, hay que agregar que la respuesta adecuada al interrogatorio planteado depende de la importancia que la propia ley atribuya a cada uno de los requisitos que exige como componentes de las solemnidades respectivas. En principio, se puede decir que todos los requisitos o formalidades ad solemnitantem deben ser cumplidos, so pena de que los actos respectivos queden viciados, porque es de presumir que la ley los ha exigido, complicando así el ejercicio de la autonomía de la voluntad, inspirada en los mismos criterios de seguridad e interés social que la han llevado a consagrar la institución de los actos solemnes. Sin embargo, este criterio no es ni puede ser absoluto, porque también es posible que algunos requisitos legales de forma solamente persigan la mayor claridad de los actos jurídicos o algo semejante, sin que su omisión afecte seriamente el elevado interés social vinculado a la institución de la solemnidad, considerada en su conjunto. En tal caso la ley misma debe encargarse, como efectivamente lo hace, de declarar que la inobservancia de tales*



PODER JUDICIAL DE LA FEDERACIÓN

*requisitos no perjudica ni la existencia ni la validez de los actos respectivos."(Páginas doscientos cuarenta y tres y doscientos cuarenta y cuatro de la propia obra antes citada).*

En conclusión, las formalidades ya sea de existencia (*ad solemnitantem*) o únicamente de eficacia probatoria (*ad probationem*) deben estar contenidas expresamente en la codificación aplicable en cada caso, y solamente la falta de formalidades ad solemnitatem pueden traer consigo la nulidad del acto jurídico por inexistencia, y la falta de formalidad *ad probationem* solamente afecta en la demostración del acto ante autoridad judicial, motivo por el cual su falta u omisión sí puede ser subsanada en juicio.

Las formalidades en cuestión deben contenerse u observarse en la celebración del acto, esto es, cuando se externa la voluntad y, una vez colmadas, dicho acto surtirá efecto para las partes; por el contrario, la falta de una o, de ambas, dará lugar a la nulidad absoluta o relativa, según el caso.

En lo que aquí interesa, sólo la falta de formalidades *ad soleminitatem* trae consigo la nulidad del acto jurídico; entre ellas, según lo preceptuado por el artículo 1795 del Código Civil Federal, la incapacidad legal de las partes o de una de ellas; vicios del consentimiento; porque su objeto o fin sea ilícito; o,

porque el consentimiento no se haya manifestado en la forma que la ley establece.

Bien, al imponerse de las constancias de autos se advierte que en éstas quedó acreditado que existió una alteración del contrato en cuanto a la fecha de su suscripción y, en confronta a lo que resolvió la responsable, los quejosos presuponen que esa alteración daba lugar a que se decretara la nulidad del contrato por existir un vicio en su consentimiento.

A saber, existe un vicio en el consentimiento de las partes cuando una de ellas hace creer a la otra o busca darle una falsa apariencia sobre la índole del negocio; la identidad del objeto; la esencia de la cosa o, de sus propiedades; la temporalidad; o, de la individualidad de la persona, en cuanto a sus cualidades singulares; elementos, todos éstos, que son determinantes de la voluntad.

De esa manera, si bien, el inducir a alguno de los contratantes a tener una falsa creencia respecto de la temporalidad de un contrato –*tiempo durante el cual las partes contratantes estarían constreñidas a cumplir con los términos del contrato, con todos los derechos y obligaciones pactados*- pudiere



**A.D. 740/2017/3.**

dar lugar a la existencia de un vicio en el consentimiento, también lo es que, tal evento, requeriría de prueba, esto es, de la justificación de que las partes no se obligaron en los términos y por el tiempo que querían hacerlo, pues de otra manera no podría hablarse de nulidad por un vicio en el consentimiento.

Por ende, que en autos quedara demostrada una alteración en la fecha de suscripción no era suficiente para tener por demostrado que existió un vicio en el consentimiento de las partes contratantes, suficiente, para declarar la nulidad del contrato, se requería de prueba en cuanto a que se debió a un engaño o, con un fin desleal de alguno de los contratantes.

Ahora, en el caso, al margen de la existencia o no, de prueba con respecto de lo anterior, los quejosos no pueden pretender la nulidad de un contrato por alteración en la fecha de celebración y, por ende, de su vigencia si, al final, lo reconocieron y obtuvieron beneficios durante su vigencia.

Para robustecer lo anterior, cabe destacar que la doctrina y la jurisprudencia comparadas (España, Alemania, Colombia y Argentina principalmente) a partir del principio de buena fe han derivado instituciones como el ejercicio antisocial del derecho (regulado expresamente en la Constitución española) el

- 18 -

**A.D. 740/2017/3.**

retraso desleal en el ejercicio de los derechos, la doctrina de la apariencia, la doctrina de los actos propios y algunos otros. Para el presente caso interesa exclusivamente esta última doctrina.

La regla que deriva del brocardo[2] *venire contra factum proprium nulla conceditur,* o doctrina de los actos propios (o de respeto a los actos propios) se basa en la inadmisibilidad de que un litigante fundamente su postura al invocar hechos que contraríen sus propias afirmaciones o asuma una actitud que lo coloque en oposición con su conducta anterior.[3]

Su fundamento radica en la confianza despertada en otro sujeto de buena fe, en razón de una primera conducta realizada, la cual quedaría vulnerada si se estimara admisible aceptar y dar curso a una pretensión posterior y contradictoria.

Se trata de una limitación del ejercicio de derechos que, en otras circunstancias podrían ser ejercidos lícitamente.

Como lo señala López Mesa[4], *"La inadmisibilidad de ir contra los propios actos constituye técnicamente un límite del ejercicio de un derecho subjetivo o de una facultad derivada del principio de buena fe y particularmente, de la exigencia de observar, dentro del*

---

[2] Del latín *brocardus.* Es un veredicto, axioma legal o máxima jurídica, normalmente escrito en latín, que expresa concisamente un concepto o regla evidente.
[3] LÓPEZ MESA, Marcelo J, op. Cit., p. 89.
[4] Ídem, p. 90.


PODER JUDICIAL DE LA FEDERACIÓN

*tráfico jurídico, un comportamiento coherente."*

La Sala Novena de Revisión de Tutelas de la Corte Constitucional de Colombia[5], entiende a esta doctrina de la siguiente manera:

*"9. El derecho fundamental al debido proceso comprende, como lo ha señalado esta Corporación, no sólo las garantías del artículo 29 de la Carta, sino también otro cúmulo de valores y principios de la misma raigambre constitucional que hacen que vaya más allá del cumplimiento de los requisitos que la ley procesal impone (debido proceso legal), a través de la irrestricta observancia de los demás derechos que permitan la vigencia de un orden justo. Dentro de estos valores y principios, a juicio de la Sala, resulta especialmente relevante para el análisis del problema jurídico planteado, el de respeto del acto propio.*

*10. El principio de respeto del acto propio opera cuando un sujeto de derecho ha emitido un acto que ha generado una situación particular, concreta y definida a favor de otro. Tal principio le impide a ese sujeto de derecho modificar unilateralmente su decisión, pues la confianza del administrado no se genera por la convicción de la apariencia de legalidad de una actuación, sino por la seguridad de haber obtenido una posición jurídica definida a través de un acto que creó situaciones particulares y concretas a su favor.*

*De ello se desprende que el respeto del acto propio*

---

[5] Sentencia T-204 del cuatro de marzo de dos mil cuatro. Expediente T-736650. Este fallo adquiere relevancia para la resolución del presente juicio de amparo, porque se trató un tema similar. En efecto, ahí se indicó que el Banco al remitir al accionante la relación de pagos hechos durante el año dos mil y al concluir que el saldo de la deuda hipotecaria al treinta y uno de diciembre de ese año era de $0.00 pesos, asumió una posición jurídica concreta frente al crédito hipotecario del accionante y así se lo comunicó, con lo que creó una expectativa sobre el estado de su deuda hipotecaria, y lo llevó a creer que su crédito había quedado absolutamente cancelado. Así, concluyó que si bien era cierto que no había paz y salvo expedido por la demandada (es decir, el documento que acredita el pago total del crédito), la conducta de ésta (Banco) mostraba claramente que la obligación fue cancelada en su totalidad con fundamento en la información suministrada por el Banco.

- 20 -

A.D. 740/2017/3.

*comprende una limitación del ejercicio de los derechos consistente en la fidelidad de los individuos a las decisiones que toman, sin que puedan revocarlas por sí mismos, más aún cuando el acto posterior se funde en criterios irrazonables, desproporcionados o extemporáneos."*

La doctrina en cuestión no es sinónimo de privación del derecho subjetivo, pues no implica su extinción, sino únicamente como se indicó, una limitación a su ejercicio, para proteger el interés de quien confió en el comportamiento previo del titular del mismo.

Más simplemente, el brocardo analizado es una aplicación del principio de la confianza en el tráfico jurídico y no una específica prohibición de la mala fe o de la mentira.

Aunque la doctrina y la jurisprudencia de cada país han delineado individualmente los presupuestos y requisitos de aplicación de esta teoría, existe consenso en señalar que los mismos básicamente son: a) un comportamiento vinculante y eficaz, b) un comportamiento posterior contradictorio que afecta las expectativas que surgen del anterior y, c) identidad jurídica de los sujetos actuantes en ambas situaciones.

No se trata de una regla absoluta. No se admite aplicación, rígida, automática de la regla, pues debe valorarse cada caso.

- 21 -

**A.D. 740/2017/3.**



PODER JUDICIAL DE LA FEDERACIÓN

Es una doctrina de aplicación residual, para cuando no hay norma expresa que regula el caso. Es decir, no corresponde aplicar la doctrina cuando la ley regula una solución expresa para la conducta contradictoria, y la permita o la impida.

No debe aplicarse cuando sea innecesaria o improcedente. La aplicación de la máxima requiere de un estricto control judicial para evitar excesos en la aplicación de la teoría.

Se aplica respecto de conductas judiciales y extrajudiciales.

Esta doctrina requiere de la existencia de un proceso para la aplicación de la regla. Sobre esta necesidad, Diez-Picazo[6] señalaba que *"para nuestra jurisprudencia la aplicación de la regla que impide venir contra los actos propios presupone siempre una situación procesal (...) es en el proceso donde no se puede venir contra los actos propios."*

El que esta doctrina tenga aplicación exclusivamente dentro de un proceso de carácter jurisdiccional no significa que el acto que se pretende contradecir se haya suscitado dentro de un

---

[6] DIEZ-PICAZO PONCE DE LEÓN, Luis, *La doctrina de los propios actos: un estudio crítico sobre la jurisprudencia del Tribunal Supremo*, Ed. Bosch, Barcelona, 1963, pp. 188 y ss. y 193.

- 22 -

**A.D. 740/2017/3.**

proceso, pues no existe inconveniente en que el mismo provenga de otro ámbito, sino únicamente que se requiere de un proceso para invocar la violación de la obligación de coherencia, generalmente como defensa.

Su aplicación no requiere de la existencia de una norma expresa, pues deriva del principio de buena fe.

Puede y debe ser aplicada de oficio por el juzgador.

Diversos tribunales y autores han considerado que esta doctrina puede aplicarse de oficio por jueces y tribunales por la vía del principio *iura curia novit*.

Es factible incurrir en la contradicción al formular una acción o una excepción, es decir, es indiferente la posición que se tenga en el proceso.

La doctrina de los actos propios puede ser utilizada por cualquiera de las partes sea que se asuma una posición activa o pasiva, pues no se trata de una excepción en estricto sentido procesal, sino de una defensa en general.

El efecto fundamental que provoca la aplicación de la doctrina es la irrelevancia de la conducta contradictoria con un



A.D. 740/2017/3.

PODER JUDICIAL DE LA FEDERACIÓN

acto anterior, esto es, que el acto posterior contradictorio no se tiene en cuenta y se está a la primera manifestación. Dicho más sencillamente, la sanción es no tomar en cuenta el acto contradictorio.

De las anteriores consideraciones derivó el siguiente criterio jurisprudencial:[7]

*"**DOCTRINA DE LOS ACTOS PROPIOS. SU DERIVACIÓN INMEDIATA Y DIRECTA DEL PRINCIPIO GENERAL DE BUENA FE**. La buena fe se define como la creencia de una persona de que actúa conforme a derecho; constituye un principio general del derecho, consistente en un imperativo de conducta honesta, diligente, correcta, que exige a las personas de derecho una lealtad y honestidad que excluya toda intención maliciosa. Es base inspiradora del sistema legal y, por tanto, posee un alcance absoluto e irradia su influencia en todas las esferas, en todas las situaciones y en todas las relaciones jurídicas. Ahora bien, a partir de este principio, la doctrina y la jurisprudencia han derivado diversas instituciones, entre las que por su importancia para la resolución de problemas jurídicos destaca la llamada doctrina o teoría de los actos propios, que deriva de la regla consignada en el brocardo que reza: "venire contra factum proprium, nulla conceditur", la cual se basa en la inadmisibilidad de que un litigante fundamente su postura al invocar hechos que contraríen sus*

---

[7] Época: Décima Época. Registro: 2001905. Instancia: Tribunales Colegiados de Circuito. Tipo de Tesis: Aislada. Fuente: Semanario Judicial de la Federación y su Gaceta. Libro XIII, octubre de 2012, tomo 4. Tesis: I.3o.C.6 K (10a.). Página: 2517.

- 24 -

A.D. 740/2017/3.

*propias afirmaciones o asuma una actitud que lo coloque en oposición con su conducta anterior y encuentra su fundamento en la confianza despertada en otro sujeto de buena fe, en razón de una primera conducta realizada, la cual quedaría vulnerada si se estimara admisible aceptar y dar curso a una pretensión posterior y contradictoria."*

Así, atento a los razonamientos expuestos, es inadmisible aceptar y dar curso a la pretensión de los quejosos si al final, reconocieron la celebración del contrato y obtuvieron beneficios durante su vigencia. Se enfatiza, atento a lo acecido y conducta de las partes, no podía declararse la nulidad del contrato, sin que lo anterior, implique soslayar el tiempo durante el cual permanecería la relación contractual entre las partes; ello, ante la falta de certidumbre y objeción de los quejosos.

Bien, en el contradictorio, se resolvió que tal evento —*fecha de celebración y, por ende, vigencia del contrato*- quedó acreditado con las pruebas periciales que se desahogaron y con las actuaciones relativas a una carpeta de investigación inherentes a una denuncia presentada por los propios quejosos; pruebas, con las que se concluyó que el contrato se suscribió en dos mil once y no, en dos mil diez, como lo sostuvieron los quejosos. Ahora, al no existir controversia sobre la conclusión de mérito —*los quejosos, en la demanda de amparo, hacen referencia a la alteración como causa de nulidad, pero no en función de que*



FORMA A-55

**A.D. 740/2017/3.**

los contratos no se hubieren celebrado en dos mil once, ni suscitaron controversia con respecto de los dictámenes periciales y de la averiguación previa- debe permanecer firme y, por ende, como fecha de suscripción del contrato la de dos mil once.

Además, con independencia de la fecha de suscripción y, por ende, de la vigencia del contrato, la temporalidad de éste no quedó condicionada a día fijo por las partes, atento a que en la cláusula sexta del contrato acordaron que "*el contrato se entenderá prorrogado, no obstante la fecha de terminación...hasta el momento que el artista cumpla satisfactoriamente con SERCA con todas las obligaciones estipuladas en el contrato*". Esto es, al suscribirse el contrato y estar reconocido éste por las partes, los quejosos quedaron obligados a cumplir con lo acordado, verbigracia, con las grabaciones de cinco álbumes nuevos e inéditos, así como de un disco en vivo, de manera que aun cuando la fecha de terminación fuere lo que pretendían los quejosos, ello no los relevaba de cumplir con la obligación de mérito.

Por último, en cuanto a los **términos y obligaciones a los que quedaron sometidas las partes para el cumplimiento del contrato**, se impone conocer el contenido de éste, en lo que interesa las partes acordaron lo siguiente.

- 26 -

**A.D. 740/2017/3.**

## SEXTA.- GRABACIONES:

"EL ARTISTA", se obliga a grabar, durante la vigencia del presente contrato:

(i)   5_ (_CINCO_) ÁLBUMES nuevos e inéditos, con un mínimo de _10__ SELECCIONES MUSICALES inéditas, divulgadas o covers (Grabaciones).

(ii)   _1_ (_UN_) Disco(s) en vivo para editarse con CD y DVD el cual contendrá como mínimo __10_(_diez_) SELECCIONES MUSICALES.

Las partes acuerdan que "SERCA" a su discreción y en base a los resultados de los ÁLBUMES previos, determinará la grabación adicional de 2 (dos) DISCOS DE CONCEPTO, por parte de "EL ARTISTA", mismo que se integrará con un mínimo de 10

9

(diez) a 15 (quince) SELECCIONES MUSICALES. Es el entendido de ambas partes que los DISCOS DE CONCEPTOS, no serán considerados bajo ninguna circunstancia como NUEVAS GRABACIONES, y no generarán a favor de "EL ARTISTA" ningún tipo de derecho artístico o regalía.

"EL ARTISTA" se obliga a presentarse en el lugar, fecha y hora que le sea indicado previamente por "SERCA", quien deberá notificárselo con una antelación no menor de setenta y dos horas antes de que se lleve a cabo la grabación de las SELECCIONES MUSICALES, las cuales deberán ser satisfactorias tecnológica y comercialmente a criterio de "SERCA". "EL ARTISTA" se presentará con la debida puntualidad y desempeñará su trabajo con toda seriedad y profesionalismo, así como en pleno uso de su capacidad física e intelectual, quedando entendido que será responsabilidad directa de "EL ARTISTA" los daños y perjuicios que pudieran derivar del incumplimiento de la presente cláusula.

Será facultad exclusiva de "SERCA", determinar la fecha en que se lanzarán al mercado los ÁLBUMES, ya sea durante la vigencia del CONTRATO (o en su caso cualquier prórroga o renovación del mismo) o luego de su terminación, independientemente de la fecha de grabación de cada uno de los FONOGRAMAS, sin que por ello se disminuyan, menoscaben o eliminen los derechos exclusivos de "SERCA", ni con ello se le otorguen derechos adicionales a "EL ARTISTA".

En caso de que "EL ARTISTA" no cumpla con las obligaciones de interpretación y grabación de las OBRAS MUSICALES contenidas en esta cláusula, el contrato se entenderá prorrogado, no obstante la fecha de terminación del presente acuerdo de voluntades estipulada en la cláusula Décima Tercera, salvo que "SERCA" decida lo contrario, hasta el momento en que "EL ARTISTA" cumpla a satisfacción de "SERCA", con todas las obligaciones estipuladas en el CONTRATO.

"SERCA" se reserva el derecho de fijar, grabar, producir, reproducir, importar, distribuir, adaptar, compilar y publicar las SELECCIONES MUSICALES, VIDEOS, DVDs, DUAL DISC, GRABACIONES EN VIVO o cualquier otro medio tecnológico conocido, o que llegue a desarrollarse en el futuro, en compilados, colecciones u otras modalidades y su comercialización, que incluyan SELECCIONES MUSICALES de "EL ARTISTA", mismas que no serán consideradas como ALBUMES NUEVOS E INÉDITOS.



PODER JUDICIAL DE LA FEDERACIÓN

Bien, para desentrañar cuál fue la voluntad de las partes, cabe destacar lo que en cuanto a la interpretación de los contratos señala el tratadista Federico N. Videla Escalada, en su obra titulada "La Interpretación de los Contratos Civiles" editor Abeledo-Perrot, monografías jurídicas, páginas 64 a 97, lo cual es del tenor siguiente:

"...a) LA AVERIGUACIÓN DE LA COMÚN INTENCIÓN DE LAS PARTES.

En la forma más sintética y esencial, esta regla puede enunciarse diciendo que, por encima del sentido literal, debe buscarse la intención común de las partes.

El punto fundamental a elucidar sobre esta regla básica es la distinción entre la intención común de los contratantes y la intención individual de cada uno de ellos.

Es muy importante, en efecto, determinar lo que tuvieron en mira ambas partes, al acordar el contrato, qué pretendieron, cuáles fueron los objetivos planteados y aclarados entre ellas y debe desecharse, en cambio, lo que cada uno pudo pensar que iba a llegar a obtener como consecuencia del acto.

De ahí que esta regla llegue a las mayores profundidades del proceso interpretativo, puesto que tiende a investigar la verdadera voluntad de los contratantes en el acto de realizar el convenio, a cuyo efecto debe computarse sólo lo que aquéllos manifestaron de palabra o

- 28 -

A.D. 740/2017/3.

de hecho en el transcurso de sus negociaciones o mediante su conducta posterior.

Esa búsqueda de la voluntad real de las partes es esencial y se hace imprescindible poner de relieve que la concreción del acuerdo demuestra que sus recíprocas pretensiones habían encontrado un medio de conciliarse en el contrato.

En relación con esta encuentra destinada a aclarar la voluntad real, no puede pasarse por alto – nunca será excesiva la insistencia en este aspecto – algo muy importante: no interesa la sola voluntad interna, sino la declaración formulada de esa voluntad.

Una expresión comprensiva de esta regla puede llevar a la siguiente enunciación; las palabras utilizadas en el contrato deben entenderse en su acepción común y general, salvo que las partes aclaren que han querido atribuirles otro significado especial."

"d) LA CONSIDERACIÓN DEL CONTRATO COMO UN TODO INTEGRAL.

Esta regla, recogida en el inciso 2° del artículo 218 de nuestro Código de Comercio, en el artículo 1161 del Código Francés, y en el 1363 del Italiano, puede enunciarse en la siguiente forma: las diversas cláusulas de un contrato deben interpretarse de una manera coherente, las unas por medio de las otras, considerando el contrato como un todo integral, cuyo contenido, espíritu y sentido, es uno.

La lógica del precepto aparece muy clara ya que si se pretende interpretar una cláusula sola separadamente, extrayéndola del contexto total del contrato y tomándola en su significado aislado, es muy

PODER JUDICIAL DE LA FEDERACIÓN

posible que resulte ambigua y no refleje la intención común ni la voluntad real de las partes.

Por el contrario, cuando se reconoce la existencia en el contrato de un todo orgánico y se lo acepta como un ente integral, como un sistema con una finalidad en sí mismo, el sentido de cada una de sus cláusulas no ha de surgir de su sola redacción, sino que ha de relacionarse con las características y los elementos de ese todo orgánico integral.

Y es común que una cláusula que en sí misma carece de la claridad indispensable y no ofrece un contenido diáfano ni revela la intención común de los contratantes, cambie de aspecto y se haga clara al vincularse con las demás y entrar a jugar en el cuerpo del acto jurídico que integra.

De ahí la utilidad que esta regla ha presentado siempre a la jurisprudencia, ya que ha servido para desentrañar problemas de suma complejidad."

"h) LA INTERPRETACIÓN INTEGRADORA

El contrato debe considerarse integrado con las cláusulas complementarias y supletorias que integran los usos sociales.

Puede afirmarse que, mientras la integración tiende a colmar lagunas existencias en la convención, la simple interpretación integradora permanece en el ámbito del contrato y procura desentrañar las consecuencias que implícitamente se encuentran comprendidas en él, entendido como expresión objetiva en el ordenamiento jurídico general."

- 30 -

A.D. 740/2017/3.

Conviene mencionar también que, el autor de referencia señala que para los efectos de la interpretación auténtica deberá tenerse en cuenta la conducta que los contratantes hubiesen observado después de concluido su acuerdo, dado que muchas veces es de gran utilidad, para precisar la intención de los contratantes, considerar las sucesivas aproximaciones, conversaciones y propuestas que tuvieron lugar antes de concluirse el convenio definitivo, las que constituyen datos precisos que ayudan al intérprete a formarse una idea clara de la finalidad que guió a aquéllos.

De la doctrina se obtiene que se han establecido tres formas generales de interpretación de los contratos; a saber: a) la averiguación de la común intención de las partes; b) la consideración del contrato como un todo integral y; c) la interpretación integradora de los contratos.

La primera forma de interpretación pretende desentrañar la intención común de las partes al realizar el pacto contractual cuando existan cláusulas que aparentemente son contrarias; la segunda, se yergue sobre la base de que para que las cláusulas de un contrato puedan entenderse en forma coherente, deben ser interpretadas las unas por medio de las otras; en ésta se considera el contrato como un todo integral, cuyo contenido, espíritu y sentido es uno.



- 31 -

A.D. 740/2017/3.

PODER JUDICIAL DE LA FEDERACIÓN

Cabe precisar que esta última forma de interpretación implica un estudio relacionado de las cláusulas, o del contenido de éstas, contenidas en el pacto contractual.

Por último, la interpretación integradora implica el análisis no sólo del contenido de lo pactado, también de los usos sociales y las conductas de las partes realizadas tanto para realizar el contrato, como posteriormente a su celebración, para descubrir la intención de los contratantes.

Así, la concatenación de lo asentado por las partes en la cláusula sexta del contrato, permite concluir que la intención de los contratantes, fue que el artista –*quejosos*- grabara cinco álbumes nuevos e inéditos, con un mínimo de diez selecciones musicales inéditas, divulgadas o covers, así como un disco en vivo. También, que "SERCA" –*tercera interesada*- se reservaba el derecho a, entre otras cosas, compilar y publicar las selecciones musicales, que incluyeran selecciones musicales del artista, las cuales, indicaron, no serían consideradas como álbumes nuevos e inéditos.

En el caso, se dio cuenta con la existencia de cuatro álbumes y un disco en vivo, lo que de suyo, en primer término, permite concluir –*sin que se suscite controversia al respecto*-  que al menos uno de los álbumes a los que se obligaron los quejosos

- 32 -

A.D. 740/2017/3.

quedó pendiente de grabar, pues estos se obligaron a grabar cinco álbumes nuevos e inéditos, con un mínimo de diez selecciones musicales inéditas, divulgadas o covers, así como un disco en vivo y, se hace hincapié, de los cinco, sólo se dio cuenta de cuatro y del disco en vivo. En suma, el contrato no se cumplió en sus términos y, ante ello, debe subsistir la condena impuesta en la sentencia de mérito, de momento, sobre la grabación de uno de los álbumes.

Ahora, la problemática se presenta en uno, de los cuatro álbumes grabados para ser considerado como nuevo e inédito –*se enfatiza, el álbum, pues el contenido podía ser satisfecho con selecciones musicales inéditas, divulgadas o covers*-. Los álbumes, de los que no se suscita controversia son "Más fuerte que Hércules", "La Neta del Planeta" y "777", mientras que del que se resolvió, no puede ser considerado como nuevo e inédito, es el denominado "La Leyenda, 12 Grandes Éxitos".

Lo anterior, expuso la responsable, porque el álbum "La Leyenda, 12 Grandes Éxitos" fue una compilación efectuada por Discos y Cintas Serca, en uso de la facultad conferida en la cláusula sexta, último párrafo, del contrato. Para robustecer su dicho, hizo una descripción de los doce temas, de los cuales, once, indicó, fueron divulgados en distintos álbumes –*aquí, cabe*



PODER JUDICIAL DE LA FEDERACIÓN

*señalar que si la responsable, para sostener esa conclusión, hizo alusión a la Ley del Derecho de Autos, sólo fue para confirmar la autoría de los álbumes, de ahí que fue acertada la cita de dicha norma-* mientras que del restante —*el ubicado en el número doce*-dijo que aun cuando no era un tema previamente divulgado, era insuficiente para resolver en distinto sentido, ya que los albúmenes debían contar un mínimo de diez selecciones musicales inéditas.

Ahora, si bien, como mencionan los quejosos, el contenido de los albúmenes podía ser satisfecho con selecciones musicales inéditas, divulgadas o covers, también lo es que para ser considerado como nuevo e inédito —el álbum- requería que esas selecciones musicales divulgadas no fueren del artista, atento que en la parte final de la cláusula sexta, del contrato, se estableció que la grabación, reproducción, entre otras, de las selecciones musicales del artista no serían consideradas como álbumes nuevos e inéditos. En otras palabras, es cierto, un álbum nuevo e inédito se podía componer con selecciones musicales divulgadas o covers, pero no por parte del artista, de tercero.

En efecto, en la cláusula sexta, del contrato, último párrafo, las partes acordaron que *"... "SERCA" se reserva el derecho de fijar, grabar, reproducir,... compilar y publicar las*

- 34 -

**A.D. 740/2017/3.**

---

*selecciones musicales...de "El ARTISTA", mismas que no serán consideradas como ALBÚMES NUEVOS E INÉDITOS".* Estos es las selecciones musicales del artista ya divulgadas no serían consideradas como albúmenes nuevos e inéditos.

Por tanto, contrario a la apreciación de los quejosos, el si la actora hizo la compilación de las selecciones musicales con su consentimiento y el que podían ser esas selecciones musicales divulgadas o covers, no era lo determinante para concluir si se estaba o no, frente un álbum nuevo e inédito, sino el que las selecciones musicales divulgadas o covers no fueren por parte del artista, de manera que si en la sentencia reclamada se dio cuenta de los fonogramas en el que se divulgaron, al menos, once de los temas por parte del artista y, sólo uno de ellos inédito, resulta inconcuso que no podía tenerse con ese álbum por cumplido el contrato en sus términos, pues debería haber contenido al menos diez selecciones musicales que, se enfatiza, no hubieren sido previamente divulgadas por el artista.

Por otro lado, de las consideraciones expuestas en la resolución reclamada éstas, contrario a lo que se dice en los conceptos de violación, reúnen los requisitos de fundamento, motivación, congruencia y exhaustividad, pues de su lectura se advierte que, la responsable, expuso los artículos y



- 35 -

**A.D. 740/2017/3.**



PODER JUDICIAL DE LA FEDERACIÓN

ordenamientos respectivos, así como las causas inmediatas por las cuales confirmó la validez del contrato, así como por las que declaró, en una parte, fundados los agravios de la apelación para concluir que quedaron dos álbumes pendientes de grabar con las características a las que se obligaron las partes; ello, a la luz de la causa de pedir, contenida en los agravios – que el álbum "La Leyenda, 12 Grandes Éxitos" no podía considerarse inédito- esto es, sin suplir deficiencia de la queja alguna y sin omitir pronunciamiento sobre algún aspecto ni apartarse de la litis.

También, se respetaron los derechos de los quejosos y formalidades esenciales del procedimiento atento que tuvieron la oportunidad de oponer excepciones y defensas, ofertar pruebas y obtener sentencia en la que se dilucidaron las pretensiones de las partes.

En suma, no sólo fue uno de los álbunes pendientes de grabar en los términos del contrato, sino dos; uno, del que no se generó controversia; y, otro, por contender canciones previamente divulgadas por el artista, en lugar de tercero o inéditas -al menos diez se requerían-. Por tanto, mientras no se cumpla con los términos del contrato éste permanecerá vigente para las partes.

- 36 -

A.D. 740/2017/3.

Aunado al análisis efectuado, es dable señalar que si bien la jurisprudencia 32/2018 (10a.) aprobada por la Segunda Sala de la Suprema Corte de Justicia de la Nación, en sesión privada del siete de marzo de dos mil dieciocho, estableció que cuando las partes invoquen en su demanda tesis de jurisprudencia, precedentes e inclusive, tesis aisladas debidamente identificadas, el órgano jurisdiccional deberá pronunciarse sobre su aplicabilidad, al margen de que el quejoso exprese o no razonamientos que justifiquen su aplicación, también lo es que, en el caso, la que los quejosos invocan, atento a las consideraciones en la presente ejecutoria, no les acarrea beneficio alguno que amerite resolver en distinto sentido, máxime que se refiere a la alteración de las cantidades en una letra de cambio, mientras que la alteración que se hizo valer en el contradictorio se opuso pero con respecto de un contrato y en el que, además, quedó manifiesta la voluntad de las partes, así como la vigencia durante la cual se obligaron.

Por último, hacer hincapié en que aun cuando algunas de las tesis que se invocan interpretan normas de la Ley de Amparo vigente hasta el dos de abril de dos mil trece, son aplicables al caso en términos del artículo sexto transitorio de la nueva Ley de Amparo, vigente a partir del tres de abril de dicho año, atento a que no se oponen a su contenido.

PODER JUDICIAL DE LA FEDERACIÓN

En las relacionadas condiciones, al haberse desestimado las manifestaciones de los quejosos y al no actualizarse alguna hipótesis de suplencia de la queja de las previstas por el artículo 79 de la Ley de Amparo, se niega el amparo solicitado.

Por lo expuesto y con apoyo además, en los artículos 73, 74, 75, 76 y 77, de la Ley de Amparo y 35, de la Ley Orgánica del Poder Judicial de la Federación, se

R E S U E L V E:

ÚNICO. La Justicia de la Unión **no ampara** ni protege a **Eliseo Robles Gutiérrez**, **Manolo Robles Pérez**, **Israel Gutiérrez Leija** y **Arístides Gustavo Carcaño Flores**, en contra de la sentencia de treinta y uno de octubre de dos mil dieciséis, con motivo del juicio ordinario mercantil 1030/2015.

**Notifíquese**, con el testimonio correspondiente devuélvanse los autos al lugar de su procedencia y, en su oportunidad, archívese este asunto como concluido.

Así lo resolvió el pleno del Tercer Tribunal Colegiado en Materia Civil del Cuarto Circuito, por unanimidad de votos de

- 38 -

**A.D. 740/2017/3.**

los magistrados Pedro Pablo Hernández Lobato (presidente) Edgar Humberto Muñoz Grajales (ponente) y la magistrada Rebeca del Carmen Gómez Garza, quienes en términos del artículo 188 de la Ley de Amparo, firman ante la secretaria de acuerdos licenciada Juanita Azucena García Correa que autoriza y da fe, hasta el trece de junio de dos mil dieciocho, fecha en que se terminó de engrosar.

MAGISTRADO PRESIDENTE

PEDRO PABLO HERNÁNDEZ LOBATO

MAGISTRADO PONENTE

EDGAR HUMBERTO MUÑOZ GRAJALES

MAGISTRADA

REBECA DEL CARMEN GÓMEZ GARZA

SECRETARIA DE ACUERDOS

JUANITA AZUCENA GARCÍA CORREA

- 39 -

**A.D. 740/2017/3.**

Esta foja pertenece a la resolución de **6 de junio de dos mil dieciocho**, dictada en el amparo directo número **740/2017/3**, en la se negó el amparo.

EN LA CIUDAD DE MONTERREY, NUEVO LEÓN, A **TRECE DE JUNIO DE DOS MIL DIECIOCHO** CON ESTA FECHA RECIBO DE LA PONENCIA A CARGO DEL MAGISTRADO **EDGAR HUMBERTO MUÑOZ GRAJALES**, LOS AUTOS Y EL TESTIMONIO DE LA EJECUTORIA DICTADA EN EL PRESENTE ASUNTO, Y EN ESTA MISMA FECHA SE ENTREGA A LA ACTUARIA PARA SU PUBLICACIÓN. DOY FE.

LA SECRETARIA DE ACUERDOS DEL TERCER TRIBUNAL
COLEGIADO EN MATERIA CIVIL
DEL CUARTO CIRCUITO.

JUANITA AZUCENA GARCÍA CORREA.

En la ciudad de Monterrey, Capital del Estado de Nuevo León, la
Secretaria de Acuerdos del Tercer Tribunal Colegiado en
Materia Civil del Cuarto Circuito, hace constar y certifica que
las anteriores copias concuerdan fielmente con sus originales
que obran en el expediente 740/17, van en
veinte (20) fojas útiles debidamente cotejadas,
selladas y rubricadas conforme a la ley, las que se expiden por
duplicado hoy quince de junio de dos mil
dieciocho

Secretaria de Acuerdos.

PODER JUDICIAL DE LA FEDERACIÓN
TERCER TRIBUNAL COLEGIADO EN
MATERIA CIVIL DEL CUARTO CIRCUITO
MONTERREY, NUEVO LEÓN