UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| SER-CA DISCOS, INC. | § | |
| | § | |
| VS. | § | |
| | § | CIVIL ACTION NO. 7:18-CV-252 |
| TIERRA CALIENTE MUSIC GROUP, | § | |
| S.A. DE C.V. D/B/A REMEX MUSIC | § | |
| and MIDAS MUSICAL, INC., | § | |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT ON DAMAGES**

On January 26, 2022, the Court found that Tierra Caliente Music Group, S.A. de C.V. d/b/a Remex Music and Midas Musical, Inc. (collectively "Defendants") were entitled to summary judgment on Ser-Ca Discos, Inc.'s request for lost profits. Dkt. #89 at 42. Defendants now ask the Court to grant them summary judgment on all other forms of actual damages that Ser-Ca Discos, Inc. may seek through its affirmative claims.[1]

I.    **The Evidence**

1.    Defendants attach the following evidence to support their request for summary judgment on all forms of actual damages that Serca may seek through its affirmative claims:

Exhibit 1:    Servando Cano Sr.'s deposition transcript;

Exhibit 2:    Servando Cano Jr.'s deposition transcript;

---

[1] To avoid repeating basic facts that the Court previously recognized in its January 22, 2022 order (Dkt. 89), Defendants ask the Court to judicially notice the factual statements contained within that order and—to the extent necessary—the previously submitted evidence on which those statements were predicated.

Defendants will rely on the same abbreviated names when referencing persons and things that the Court itself utilized in its January 22 order: Servando Cano Rodriguez ("Cano"); Servando Angel Cano Resendez ("Cano Jr."); Hector Cano ("Hector"); Claudia Cano ("Claudia"); Jose Antonio Cano ("Antonio"); Ser-Ca Discos, Inc. ("Serca"); Discos y Cinta Ser-Ca, S.A. de C.V. ("Serca-Mexico"); and the 12 songs and music videos that Defendants recorded with La Leyenda ("the subject media"). Dkt. 89 at 5, 9.

Exhibit 3:    Hector Cano's deposition transcript;

Exhibit 4:    Claudia Cano's deposition transcript;

Exhibit 5:    Jose Antonio Cano's deposition transcript;

Exhibit 6:    Veronica Blanco's deposition transcript; and

Exhibit 7:    License Agreement between Serca and Serca-Mexico, along with its English translation.

## II. What the Evidence Shows

2.    Cano is Serca's owner and president. Ex. 1 at 12.[2] Cano's notable deposition testimony consists of the following.

(a)    Cano's business entities never made a profit on La Leyenda's music recordings because their production and promotion costs were greater than the revenue those recordings brought in. *Id*. at 41-42.

(b)    Serca contracted with a company called Select-O-Hits to distribute its recordings. *Id*. at 33.

(c)    Serca's "decision-makers" are Cano's children—namely, Cano Jr., Claudia, and Antonio. *Id*. at 10.

(d)    Cano Jr. and Claudia are the people most responsible for Serca's finances. *Id*. at 11.

Cano was unable to provide any testimony as to what damages, if any, Serca incurred as a result of Defendants' complained-of actions. *Id*. at 4-76.

3.    Antonio is employed by Serca to promote songs on the radio. Ex. 5 at 7-8. At his deposition, Antonio testified that he has no knowledge whatsoever of any damages that Defendants have caused Serca.

Q. Serca—Let me ask you this: Are you aware of anything that Tierra Caliente or Midas Musical have done to cause harm to Serca Discos, Inc.?

A. No, I have no knowledge either.

Q. (BY MR. THOMAS) Are you aware of anything that Tierra Caliente or Midas Musical has done that would—that Serca Discos Inc. would consider offensive[?]

A. Again, I'm also unaware.

---

[2] Though Cano died during the pendency of the litigation, he will be referred to in the present tense for ease of reference.

> Q. (BY MR. THOMAS) Okay. As far as you know, I mean you're the guy that is there on the ground supervising the other two employees, can you think of anything that my clients have done that have effected the way you are able to do your business—to interfere with the business that you do?
>
> . . . .
>
> A. I don't know.
>
> Q. (BY MR. ALONSO) You're not aware of anything?
>
> A. No.

Ex. 5 at 26-27 (objections omitted).

4.      Hector is the president and owner of Sultana, which puts on concerts and promotional events for artists. Ex. 3 at 5-6. Hector's notable deposition testimony consists of the following.

(a)    Serca focuses on the distribution of music recordings, while Sultana focuses on live presentations. *Id.* at 7-8.

(b)    Any live performance by La Leyenda in the United States occurred through Sultana—not Serca. *Id.* at 10-11.

(c)    Hector does not know how many artists Serca works with. *Id.* at 16-17.

(d)    Hector knows nothing of Serca's finances, *id.* at 11, testifying:

> Q. Do you know anything about [Serca's] finances?
>
> A. No.
>
> Q. Do you review any of their tax returns or their financial statements?
>
> A. No.
>
> Q. Are—do you know—do you see any of the royalty statements?
>
> A. No, sir.

5.      Claudia is one of two people—the other being Cano Jr.—that Cano identified as having the most knowledge of Serca's finances. Ex. 1 at 11. Claudia however, testified that she has (1) no knowledge of Serca's finances; and (2) no knowledge of any damages Serca has allegedly incurred as a result of Defendants' complained-of actions. Ex. 4 at 38-39, 43-45, 62-63, 65.

> Q. Do you know if Ser-Ca Texas files a tax return in the United States?

A. I don't have the knowledge.

Q. Okay. Earlier you said that Veronica Blanco works for Ser-Ca Texas. Do you know who pays her?

A. No, I don't know it.

Q. Okay. Do you know who [sic] Ser-Ca Texas makes its money?

A. No, I don't know it.

Q. Do you know if Ser-Ca Texas makes money for Discos Y Cintas?

A. I don't know it.[3]

     . . . .

Q. (By Mr. Garcia) And so here again, you know, we're—they're asking your father, "What title does Claudia have." He says, "She's the administrator of the company. And then he asks, "Who is the most"—"Who is the person most responsible for the finances of this company," and your father says, "Well, it's both of them. Well, I'm the owner with my two children." Okay. So do you have anything to do with the finances of Discos Y Cintas?

A. The only thing that I have to do with it is that I sign on the checks, but I'm not an owner.

Q. Okay. So you sign checks on behalf of Discos Y Cintas?

A. Yes.[4]

     . . . .

Q. Yeah. So, you know, Discos Y Cintas makes money off of Ser-Ca Texas, and that's completely fine. I'm just trying to figure out how does Discos Y Cintas collect the money that Ser-Ca Texas makes for promoting the artists in the United States.

A. I don't have the knowledge.

Q. Okay. So you're not involved in the—in those—in that aspect of the finances for any of the— for any—for Discos Y Cintas and Ser-Ca Texas, correct?

A. I only sign on the checks.

Q. Okay. So you only sign checks for money going out of Discos Y Cintas, correct?

A. Yes.[5]

     . . . .

---

[3] Ex. 4 at 38-39.

[4] *Id*. at 41.

[5] *Id*. at 43-44.

Q. (By Mr. Garcia) Okay. So when your father testified that you were responsible for the finances of the company, you're—you disagree with that, correct?

A. I only signed the checks, and the others would oversee the rest. And why would I do this? Because those are people that I trust.[6]

. . . .

Q. Okay. Let's talk about revenues for a second. Do you have any knowledge or information about the revenues that Ser-Ca Texas has received from La Leyenda music sales?

A. No.

Q. Okay. Do you have any knowledge or information about the expenses that Ser-Ca Texas has incurred for La Leyenda music sales?

A. No.

Q. Okay. Do you have any knowledge or information about the net profits or losses Ser—Ser-Ca Texas has incurred from La Leyenda music sales?

A. No.

Q. Okay. Do you have any knowledge or information about the royalties that Serca, Inc. has received from La Leyenda music sales?

A. No.

Q. Okay. Do you have any information or knowledge about the royalties paid to or owed to La Leyenda?

A. No.

Q. Okay. Do you have any knowledge or information about the revenues which Ser-Ca Texas has paid or transferred to Discos Y Cintas?

A. I don't have the numbers.

Q. (By Mr. Garcia) I'm not quite sure what your answer means, so I'm going to ask it again. Do you have any knowledge or information about the revenues which Serca, Inc. has paid or transferred to Discos Y Cintas?

A. No.

Q. Okay. Do you have any knowledge or information about the revenues which Ser-Ca Texas has paid or transferred to Discos Y Cintas specifically pertaining to La Leyenda?

---

[6] *Id.* at 44-45 (objections omitted).

A. No.[7]

   . . . .

Q. Okay. And do you have any knowledge of what alleged damages Ser-Ca Texas has suffered as a result of any acts by my clients?

A. No.[8]

Claudia also notably testified that any and all net profits that Serca acquires from the distribution of music recordings are given to Serca-Mexico pursuant to numbered paragraph 7(d) of those entities' licensing agreement. Ex. 4 at 52; Ex. 7.

6.    Veronica Blanco ("Blanco") first started working for the Cano family through Ser-Ca Publishing ("Serca Publishing"). Ex. 6 at 13-14. She is currently employed by, and performs secretarial work for, both Serca and Serca Publishing. *Id*. at 17, 19. At her deposition, Blanco notably testified to the following.

(a) Blanco is Serca's only employee who is not a member of the Cano family, and she is also the only employee who regularly works out of the office. *Id*. at 20, 30-31.

(b) Serca and Serca Publishing share the same office space. *Id*. at 17. Blanco works approximately 65% of her time for Serca Publishing and 35% of her time for Serca. *Id*. at 20.

(c) Serca pays no money to any music artist. *Id*. at 41.

(d) Any money Serca generates through the digital streaming of its artists' music is paid to it in one sum — i.e., the payment does not reflect how much was earned from a specific artist. *Id*. at p. 38-41, 88-89.

(e) The money in Serca's bank account is, on average, less than $50,000. *Id*. at 76-77.

(f) Blanco is unaware of (1) any live performances that Serca handled for La Leyenda; (2) any income that Serca has received from La Leyenda's live performances; or (3) any revenue that Serca has received from La Leyenda's music sales. *Id*. at 78-79.

(g) Blanco is unaware of any music artist with which Serca has directly contracted. *Id*. at 91.

---

[7] *Id*. at 62-63 (objections omitted).

[8] *Id*. at 65.

7.    Blanco also made clear at her deposition that she has no information as to (1) how Defendants have caused any injury to Serca; or (2) how Serca was financially impacted through its business dealings with La Leyenda.

> Q. . . . Are you aware of anything that Tierra Caliente or Midas Musical has done to cause harm to Ser-Ca Discos, Inc.?
>
> A. No.
>
> Q. Are you aware of anything that Tierra Caliente or Midas Musical has done to interfere with the business of Ser-Ca Discos, Inc.?
>
> A. No.[9]
>
> . . . .
>
> Q. . . . If Ser-Ca Discos, Inc., is claiming that it has suffered losses or damages because of something that my clients did or didn't do, are you able to speak to that?
>
> A. I don't know.
>
> Q. Are you aware of any such damages?
>
> A. I don't know because I don't know if there is any damages or not. I don't know.[10]
>
> . . . .
>
> Q. Do you know what percentage of—of Ser-Ca Discos, Inc.'s revenue were represented by La Leyenda?
>
> A. No, I don't know.
>
> Q. Are you able to speak to or testify as to any losses that Ser-Ca Discos, Inc. has had as a result of no longer representing La Leyenda?
>
> A. No, I wouldn't.
>
> Q. Are you able to speak to any losses or revenues that Ser-Ca Discos, Inc. has lost—has incurred as a result of something that my clients did or didn't do?
>
> A. No, I wouldn't.[11]
>
> . . . .
>
> Q. So when it comes to trial, are you able to testify about any revenues that La Leyenda—that Ser-Ca Discos received for La Leyenda?

---

[9] *Id*. at 57.

[10] *Id*. at 57-58.

[11] *Id*. at 59-60.

A. No.

Q. When it comes to trial, are you able to testify as to any expenses that Ser-Ca Discos incurred pertaining to La Leyenda?

A. No.

Q. . . . Do you have any knowledge or information about the revenues Ser-Ca, Inc. has received from La Leyenda music sales?

A. No.

Q. Do you have any knowledge or information about the expenses that Ser-Ca, Inc. has incurred for La Leyenda music sales?

A. No.

Q. Do you have any knowledge or information about the net profits or the net losses that Ser-Ca, Inc. has incurred from La Leyenda music sales?

A. No.[12]

. . . .

Q. Do you know what percentage of Ser-Ca, Inc.'s revenue that La Leyenda represented?

A. No, I don't know.[13]

8.     Cano Jr. is Serca's vice-president. Ex. 2 at 37. He is also Serca's only employee/representative whose testimony has not already been discussed herein. At his deposition, Cano Jr. testified to the following.

(a)  Serca is a Texas-based record company that sells records and promotes artists. *Id*. at 11.

(b)  Serca's brick-and-mortar presence consists of a "really small" recording studio located in Pharr, Texas, which it rents from Cano Jr. *Id*. at 14, 117-18.

(c)  Serca has only three employees: Cano Jr., Antonio, and Blanco. *Id*. at 17-18.

(d)  Though Cano testified that Cano Jr. was someone who had the most knowledge of Serca's finances, Cano Jr.'s deposition testimony revealed that (1) he never sees Serca's financial statements (*id*. at 38); (2) he has no idea whether Serca has any unpaid loans (*id*. at 117); (3) he does not know who signs checks to pay Serca's business expenses (*id*. at 36-37); (4) he does not know where Serca has its bank

---

[12] *Id*. at 87-88.

[13] *Id*. at 91.

8

account (*id*. at 37); and (5) he does not possess a debit card or credit card for Serca (*id*. at 117).

(e)     Serca has never had a contract with La Leyenda or any other recording artist. *Id*. at 14, 25, 29.

(f)     Serca has never recorded a song for La Leyenda. *Id*. at 47.

(g)     Serca has never controlled or managed La Leyenda's concert performances. *Id*. at 15-16, 36.

(h)     Neither Serca-Mexico nor Serca participated in the recording of the songs at issue in this suit. *Id*. at 74-75. Serca in no way contributed to the creation of the subject media. *Id*. at 75.

(i)     If Serca did ever make any revenue from the sale of La Leyenda's music, it is Serca-Mexico who performs an accounting of that revenue and who decides what, if any, royalties are paid to La Leyenda. *Id*. at 35-36.

(j)     Serca previously had a contract with Select-O-Hits, but it has since switched over to Ingrooves. *Id*. at 26-27. Serca goes through companies like Select-O-Hits and Ingrooves to get an artist's music onto digital streaming platforms. *Id*. at 26-27, 97. Serca does not contract directly with the digital streaming platforms. *Id*.

(k)     When asked how many artists Serca-Mexico has sent over to Serca, Cano Jr. could not quantify the number; he could only state that it was "a lot of artists." *Id*. at 97. Cano Jr. does not know how much money Serca makes from any specific artist because he does not "see the finances." *Id*.

9.     At his deposition, Cano Jr. could not identify any person that would be better than him at testifying about the damages Serca has allegedly incurred as a result of Defendants' complained-of actions. *Id*. at 83-85. While struggling to articulate Serca's damages, Cano Jr. testified as follows.

Q.  . . . What is it that Ser-Ca—how is it that Ser-Ca was harmed, and I'm talking about Ser-Ca Texas, Ser-Ca Discos, Inc., how is that Ser-Ca Discos, Inc. was harmed by anything that my clients Tierra Caliente and Midas did?

A.  How are we harmed?

Q.  Yes—

A.  Well—

Q.  —if at all?

9

A.   —it—they, they did harm. They released several, several songs that they shouldn't have. It might be one it was a surprise, but they release eight. And—they released eight. I know that the first one, oh, I didn't know that; but eight, that's kind of difficult—

Q.   Okay.

A.   —to not understand that.[14]

. . . .

Q.   How did the release of the eight songs do any kind of harm to Ser-Ca Discos, Inc.?

A.   It, it puts us in a bad position because they're not honoring their contracts, and it doesn't— and the public image of the company is damaged by that. Because they were releasing stuff that they shouldn't have, and they were announcing that—because some other groups can say, hey, we can break our contracts with Ser-Ca at any point we want.

Q.   Ser-Ca who?

A.   Ser-Ca whatever.

Q.   Well, no, because—

A.   That—if Serca Mexico or Ser-Ca Disco, whatever. And we can break our contracts with them and that leaves us in a bad position, leaves a bad image about us.

Q.   Okay. Anything else? Any other way?

A.   Well, they prevented us for, for making any more money with them. We had—like, like you said, we had sources of income and by doing that, they, they got into our business and they damaged—they did some damage.

Q.   Anything else?

A.   They—it's, it's—they do damage in a lot of ways.

Q.   (BY MR. THOMAS) But can you—yeah, and that's why we're here is to ask you if you can think of any other—

A.   Okay.

Q.   —ways right now?

A.   With our publishing company, with our record label, with everything. Our image is damaged, it's harmed by what, what—by with what they did. Because they, they were announcing that they were out of the contracts, and they were not. Now we—it's clearly they are not out of the contract because they're honoring

---

[14] *Id.* at 85.

now, as of today. And they did some damage and they have to, they have to be responsible for that.[15]

. . . .

Q. (BY MR. THOMAS) Yeah. So the—I mean, you've already made it very clear that Ser-Ca Texas did not have a contract with—

A. Uh-huh.

Q. —La Leyenda, correct?

A. Yes.

Q. And the contract with La Leyenda was with Serca Mexico?

A. Uh-huh.

Q. Correct?

A. Yes.

Q. And so, in fact, not only did Ser-Ca Texas not have a contract with La Leyenda, I think you told us you can't think of any artists that Ser-Ca Texas has a contract with?

A. I don't remember that, right.

Q. Right. And so—

A. So—

Q. —but the harm that you're talking about, if, if that really was a harm that was caused by my client, that would be a harm that was caused to Serca Mexico, correct?

A. No. Because they have a—Ser-Ca can, can send business to Ser-Ca, Ser-Ca-Texas and, and this, this, this things that they did prevented us for doing business, even if we don't have a direct contract Serca Mexico has it, but they can defer it to anyone.[16]

. . . .

Q. How much money damages is Ser-Ca-Texas asking from my client?

A. Well, there, there are several. There are several, there are several—

Q. Components of that?

A. —components of that, yes.

Q. Okay. Let's go through them.

A. Well, in record sales.

Q. Uh-huh.

---

[15] *Id.* at 86-87 (objections omitted).

[16] *Id.* at 88-89.

A. We lost record sales. We, we, we lost public performance royalties.

Q. When you say "public performance royalties," you mean public performance revenues?

A. Yes.

Q. Okay. What else?

A. Eliseo received some money from the Chavez brothers that shouldn't be—that I think shouldn't be sent to them, it should be sent to us because we—they were still under contract, because that was the reason of the, of the advance. We also—our image is being mistreated because of what the—what La Leyenda and the company did. And they did it publicly. It wasn't a secret. You already said that they, they announce it and they, they did damage to our image as a company.

Q. The lost—let's go back through these one by one—

A. Okay.

Q. —and go in reverse order. The image, you said that it hurt the image of, of Ser-Ca Texas—

A. Uh-huh.

Q. —so have you been able to quantify and put a number on, on that?

A. Well, I think it was like a million. I think it was like a million.

Q. Where did you get that?

A. Well, when you do damages like this one, it hurts, it hurts a lot your intercompany's image.

Q. But did you just pick that number out of the air?

A. No, no. We—of the, of the, of the revenue that should be come to us but with this bad publicity, with this bad publicity, we, we lost this area. It might even be more.

Q. Yeah. But I just need to know how you calculated this million?

A. Well, we did a lot of—I can't, I can't tell you now but we came up with the number.

Q. Who is "we"?

A. Huh?

Q. Who is "we"?

A. Me.

Q. Right. So how did you come up with the number?

A. Like I said, we did a calculation. I don't have it now, but we, we can present it to you at any point, yeah.

Q. But—and I'm confused, because you said "we" came up with a calculation?

A. I made a mistake of doing that, but I, I—

Q. But it was just you?

A. Yeah.[17]

. . . .

Q. What was the, the total gross revenue that Ser-Ca Texas had in—for example, the last time you filed a tax return, last year?

A. I don't, I don't know—I don't know this last year, because like I said I don't see finances. But they're, they're good.

Q. Well, if you don't see the finances, how is it you were able to make the calculation?

A. Yeah, that's, that's one of the points. Like I said, it's a very—it's not a cal—one plus one, but we came up with that.

Q. All right. But if you don't—

A. Yeah, we took a lot of—I—a lot of components to get to that number.

Q. If—

A. I don't have it with me now but I can...

Q. Yeah. But if you're not the one who knows anything about the finances, you don't see the tax returns, you don't see the financial statements, you don't see the bank statements, you don't even sign the checks, how is it that you were the one that was able to all by yourself come up with these calculations?

A. Well, it wasn't all by myself. Like I said, I, I asked somebody and then you get all those numbers and you get to the point.

Q. So in order to come up with the numbers that you came up with, you did look at the tax returns?

A. No. But I, I asked, I asked people in the company.

Q. What company?

A. In Ser-Ca.

Q. Which Ser-Ca?

A. Texas.

Q. Who did you ask?

A. The accountant. The—when I saw—I saw some checks and that's it.

---

[17] *Id*. at 89-92.

Q. Who is the accountant?

A. I don't remember the name. I think he just change it last year. But we can—but I can send—I can send it to you now as soon as, as I—because there is a new one.

Q. There is a new accountant. Well, who was the old one?

A. I don't remember the name of the guy.

Q. Who is the new one?

A. Like I said, I, I don't remember.

Q. So you don't know the name of the old accountant or the new accountant?

A. No. I just talk to them. Our company is very —it's very big. And we—

Q. I see. How, how many employees do you have?

A. Yeah. But it's not that I, I talk with every employee. I do a lot of, a lot of stuff with other peoples.

Q. How many employees does Ser-Ca Texas have?

A. Like I told you before, Veronica, my brothers, me and that's about it.

Q. Okay. So less than five?

A. Yes.

Q. What were the—what was the total gross income before, as reported on the tax returns for Ser-Ca Texas last year?

A. I know this year. I know this year. I know it's more than 2 million as of this year.

Q. Gross?

A. Yeah. But as—the last time I saw it, it was a while ago.

Q. Okay. What's, what's the most gross revenue that Ser-Ca Texas has had that you can recall in a given year?

A. More than a million.

Q. More than a million?

A. Yeah.

Q. And that's for all revenue from all sources?

A. Yeah. But I—like I said, I don't know the exact number, but it's more than a million.

Q. Right. But less than 2 million?

A. This year is going to surpass 2 million easily.

Q. Okay. But before this year?

A. More than a million. Like I said, I don't know the exact number, but it's more than a million.

Q. Okay. And so before this year it would be true that Ser-Ca, Inc. never had gross revenues of—that exceeded 2 million that you know of?

A. I, I can't be for sure.

Q. Okay. And, and of course, you have expenses?

A. Yes.

Q. And so you would have a taxable income after you deduct the expenses?

A. But like I said, I don't know finances.

Q. I, I know, but you had to see something to come up with these damages. And here's where I'm going.

A. Uh-huh.

Q. I think if we look at the tax returns and the financial statements—

A. Uh-huh.

Q. —for Ser-Ca-Texas, you've never had taxable income of more than a million dollars in any given year.

A. Okay.

Q. Agreed?

A. I don't know.

Q. And that would be from revenues from all sources. So what, what portion of Ser-Ca-Texas' total revenues did La Leyenda make up?

A. I don't remember. I didn't see finances.

Q. A tiny part?

A. Well, it's—like I said, I don't know.

Q. Less than 10 percent?

A. I don't know.

Q. Well, how many different artists does Serca Mexico manage—not manage, but, but how many record sales—no. Let me think of a different way to ask this. When you had Selecto Hits and now you have Ingroove—

A. Uh-huh—

Q. —I, I take it the artists that are signed up with Serca Mexico are run through Ser-Ca Texas to get to either Selecto Hits or Ingroove—Ingroove, agreed?

A. Yes.

Q. So how many of those artists are there?

A. We have a lot of artists that, that—we have a lot of artists, but we cannot determine who makes what because, like I said, I don't see the finances of it.

Q. What do you mean you can't determine? How do you pay royalties?

A. I don't, I don't see the finances. I don't pay them. I told you that before.

Q. Right. But somebody pays them?

A. Yeah. But I don't, I don't know who it is.

Q. So you have, as we sit here today, no idea of all the total revenue that Ser-Ca-Texas makes in any given year, you have no idea how much of that is represented by La Leyenda, agreed?

A. At this point, no.

Q. Okay. You also mentioned that you had lost public performance revenues?

A. Uh-huh.

Q. Right?

A. Yes.

Q. Except that you told us that Ser-Ca-Texas does—is a record label, it's a record company. It doesn't do promotions for concerts and things like that?

A. No, but it's like—some of this, and also like the, like the place—the, the—how can I say it in English? It's like the, the place on the radio and that stuff.[18]

. . . .

Q. (BY MR. THOMAS) Okay. So, so—let me see if I can get this right. So what you told us when we were off the record in Spanish is that, is that you're claiming that Ser-Ca-Texas lost sales from music that's played on the radio?

A. Also, yes. Sound and change [sic] and a lot of, a lot of—there is a lot of—

Q. Right.

A. —of—there is not one particular, just a lot of components to every—[19]

. . . .

---

[18] *Id.* at 92-98.

[19] *Id.* at 98.

Q. All of the songs that La Leyenda recorded through Serca Mexico, you guys still own the rights to that, don't you?

A. Yes.

Q. And if you want to—and you're still generating revenue from that?

A. Yes.

Q. Okay. And there's nothing that my client has done to stop you from continuing to exploit and make revenue from the songs that La Leyenda recorded for Serca Mexico, agreed?

A. They took eight songs out. That's—how can they have called—how can you not say that they didn't, they didn't do something. They did.[20]

. . . .

Q. . . . So my question was, don't you—my— there is nothing that my client has done to stop you, your company, from enjoying whatever revenues you're entitled to enjoy—

A. Uh-huh.

Q. —from the songs that La Leyenda recorded for Serca Mexico, right? You, you still get those revenues?

A. Yeah.[21]

. . . .

Q. So how does streaming these disputed songs hurt your image?

A. Because it was—it could look as we are saying lies, that we, we don't have the contract. And we have a right to the contract. Like I said, they're, they're, they're recording now, it's better for our image because they are honoring the contract that they should have honored before. We wouldn't be in this lawsuit if we—if we, they were—if we, if they will honor this, this situation, right. In this business image is more valuable.

Q. Uh-huh. So if the songs are playing on—if the disputed songs are being streamed on Spotify—

A. Uh-huh.

Q. —on, on Pandora, on iTunes, how does that hurt your image?

A. Because it looks that they would—that, that we're like in agreement that we're, we're not in a good standing with our

---

[20] *Id*. at 104.

[21] *Id*. at 105.

contract. And like image is everything. Image is everything in this business.

Q.  But how would anyone know that?

A.  They, they, they publicly told everybody that my father does this—did this or that. So we have to let people know that we didn't do anything wrong, in this contract or any other contract that we do, that they are did. That is more valuable than any, than any income streaming—or streaming or whatever.[22]

### III.  There is Legally Insufficient Evidence of Actual Damages[23]

10.  In the Court's proposed jury charge, which was emailed to all parties on February 13, 2023, the jury is invited to determine what actual damages, if any, that Serca has sustained as a result of any unfair competition by trademark infringement on the part of Defendants. The actual damages the jury is instructed to consider consist of (1) injury to Serca's reputation; (2) injury to Serca's goodwill, including injury to Serca's general business reputation; (3) the expense of preventing customers from being deceived; and (4) the cost of future corrective advertising reasonably required to correct any public confusion caused by the unfair competition. The above-referenced evidence, however, warrants a summary-judgment determination that Serca has sustained no such damages.

11.  *First*, the evidence establishes that Serca never organized or promoted—nor had the contractual right to organize or promote—La Leyenda's live performances in the United States; rather, that role and right belonged to Sultana. Ex. 2 at 15-16, 36 (Cano Jr.); Ex. 3 at 10-11 (Hector); Ex. 6 at 78-79 (Blanco). Therefore, Serca cannot complain about any injury to reputation, injury to goodwill, or public deception/confusion stemming from any live performance that Defendants organized or promoted for La Leyenda. *Second*, the evidence establishes that Serca never recorded—nor had the contractual right to record—

---

[22] *Id.* at 112-13.

[23] The standard of review for a motion for summary judgment is known to this Court. *See, e.g., Guevara v. Cajun Operating Co.*, No. 7:19-CV-00386, 2020 WL 6385680, at *1 (S.D. Tex. Oct. 9, 2020) (J. Crane).

any of La Leyenda's music; rather, that role and right belonged to Serca-Mexico. Ex. 2 at 47 (Cano Jr.); Ex. 6 at 34-35 (Blanco); Ex. 7 (Contract). Therefore, Serca cannot complain about any injury to reputation, injury to goodwill, or public deception/confusion stemming from Defendants' mere recording of the subject media. *Third*, the evidence establishes that Serca has never had a contractual relationship with La Leyenda or any other music artist; rather, it was Serca-Mexico that possessed the direct contractual relationship with any artist. Ex. 2 at 14, 25, 29 (Cano Jr.); Ex. 6 at 91 (Blanco). Therefore, Serca cannot complain about any injury to reputation, injury to goodwill, or public deception/confusion stemming from Defendants' mere act of contracting with La Leyenda and their subsequent publicizing of that fact.

12.    The evidence supports a determination that Serca has no reputation or goodwill to speak of. Serca merely exists at the pleasure of Serca-Mexico, for Serca operates as a mere tool or business conduit of Serca-Mexico. Specifically, Serca-Mexico simply utilizes Serca to negotiate and execute contracts with third parties in the United States (e.g., Select-O-Hits and Ingrooves) that are in the business of contracting directly with digital streaming platforms (e.g., YouTube, Spotify, Apple Music) to negotiate the online distribution of artistic work. Cano Jr. explained this point at his deposition.

Q.    Does Ser-Ca Discos, Inc. have a contract with Selecto Hits?
A.    Yes, had.
       . . . .
Q.    Why did the contract terminate?
A.    Because we started working with another company.
Q.    Which one?
A.    Ingrooves.
       . . . .
Q.    Ingrooves. All right. And, and what does Ingrooves do?
A.    It's, it's the same as—like a record distributor. It's because the music business is evolving.
Q.    A lot.

A.    Yeah. They, they do one thing, tomorrow another, but…

Q.    Okay. Does, does Ser-Ca Texas have a contract with Spotify?

A.    I don't see that directly, to be honest, but it has to. I think Ingrooves is the one that takes care of it.

Q.    Okay. Same with Pandora, Apple Music—

A.    Yeah.

Q.    —YouTube, all of that?

A.    Yes. Yes.

Q.    So your company would have a contract with Ingrooves and then Ingrooves takes care of all of the—

A.    Yes.

Q.    —different platforms?

A.    Yes.

Q.    . . . When you had Selecto Hits and now you have Ingroove—

A.    Uh-huh—

Q.    —I, I take it the artists that are signed up with Serca Mexico are run through Ser-Ca Texas to get to either Selecto Hits or Ingroove—Ingroove, indeed?

A.    Yes.

Ex. 2 at 26-27, 97.

13.    There is simply no evidentiary or logical basis for believing that Serca—a nondescript entity—has cultivated a reputation or any goodwill with the general public in the course of fulfilling its inconsequential role in the "entity chain" linking Serca-Mexico with digital streaming platforms. There is also no evidentiary or logical basis to conclude that anyone in the general public has been confused or deceived by Defendants' online promotion of the subject media—for such a conclusion would need to be predicated on evidence (none of which exists) showing a public awareness of Serca's role in the aforementioned chain. Relatedly, there is no evidentiary or logical basis for believing that Serca will have to incur the cost of future corrective advertising to correct any public confusion caused by Defendants' complained-of actions—for there is no evidence that the general public is even aware of Serca's existence.

14.    The Court should also observe there is no evidence to support a finding that any reputation or goodwill that Serca has with digital streaming platforms has been harmed. As previously stated, Serca does not even contract with any such platforms. Ex. 1 at 33 (Cano); Ex. 2 at 26-27, 97 (Cano Jr.). Further, no one capable of speaking for Serca testified

- that as a result of Defendants' complained-of conduct, any digital streaming platform has refused to stream artistic work that was created by Serca-Mexico and distributed in association with Serca;

- that as a result of Defendants' complained-of conduct, Serca has incurred non-legal expenses to prevent digital streaming platforms from being deceived;

- that as a result of Defendants' complained-of conduct, Serca must now incur the cost of future corrective advertising to remedy a digital streaming platform's confusion.

15.    To the extent it can be said that Serca has a "customer," that customer would be limited to distribution entities like Select-O-Hits and Ingrooves—on whom Serca relies to distribute Serca-Mexico's recordings through digital streaming platforms. But there is no evidence that Defendants' complained-of actions caused any distribution entity to either cease or resist doing business with Serca. In fact, Cano Jr. testified that Serca left Select-O-Hits on its own initiative and joined with Ingrooves after Defendants' complained-of actions had occurred. Ex. 2 at 26. This reality undercuts any contention that Defendants' complained-of actions have had a negative and prolonged effect on Serca's dealings with distribution entities. Lastly, there is no evidentiary or logical basis for believing that, as a result of Defendants' complained-of conduct, Serca has and will continue to incur non-legal expenses to remedy any distribution entity's confusion.

16.    Cano Jr. did not provide any testimony that would justify the denial of this motion for summary judgment. In attempting to identify Serca's damages, Cano Jr. first asserted that Serca's image was harmed by La Leyenda's alleged failure to fully perform under its contract since that failure could purportedly embolden other artists to break their own contracts. Ex. 2 at 86-87. But that wildly

speculative theory of damages is only pertinent to Serca-Mexico since Serca itself has no contract with any artist. *Id*. at 88-89. To get around that point, Cano Jr. then asserted that Serca can still be harmed by such conduct because it gets its business from Serca-Mexico; in other words, he argued that an injury to Serca-Mexico's image translates to a loss of revenue for Serca. *Id*. at 86-87. This argument is problematic, however, because Serca can only recover damages that stem from injury to its own image—not Serca-Mexico's image. Furthermore, Cano Jr. is espousing a theory of damages that lacks reasonable foreseeability. *See generally Skydive Arizona, Inc. v. Quattrocchi*, 673 F.3d 1105, 1111 (9th Cir. 2012) (recognizing that, in awarding damages under the Lanham Act, a court assesses damages sustained by the plaintiff in the same manner as in tort damages, which requires that the harm caused by the wrong be reasonably foreseeable). Lastly, it should be noted that La Leyenda entered its recording agreement with Defendants in August 2015, and Cano Jr. provided deposition testimony over four years later in September 2020. Dkt. 89 at 6; Ex. 2 at 1. And though, at the time of his deposition, more than four years had passed from La Leyenda's purported breach of its contract with Serca-Mexico, Cano Jr. was still unable to identify a single artist that had breached its contract with Serca-Mexico as a result of Defendants' complained-of actions.

17.    Cano Jr. then testified that Serca lost revenue that would have stemmed from La Leyenda's public performances. Ex. 2 at 89-90. But the evidence already discussed herein establishes that, to the extent any Cano entity had a claim to such revenue, the claim to that revenue belonged to Sultana alone. Ex. 3 at 10-11 (Hector). Furthermore, Cano Jr. could provide no explanation as to how any performances La Leyenda did in the United States in collaboration with Defendants caused any injury to Serca's reputation or goodwill. No such explanation could be provided because Cano Jr. acknowledged that Serca was never involved with La Leyenda's performances in the United States.

22

Ex. 2 at 15-16. Lastly, this is a matter that only concerns lost profits, which the Court has already disposed of on summary judgment.

18.    Cano Jr. later testified that Serca was injured because it lost revenue that would have been generated from playing La Leyenda's music on the radio. Ex. 2 at 98. He acknowledged, however, that nothing has stopped Serca from playing songs on the radio that La Leyenda recorded with Serca-Mexico. *Id*. at 104-05. He also failed to explain how Defendants' actions—specifically, those actions that would support a finding of liability for unfair competition by trademark infringement—impaired Serca's ability to earn radio revenue. Lastly, this is yet another matter that only concerns lost profits, which the Court has already disposed of on summary judgment.

19.    When asked to try to quantify the monetary damage that Defendants purportedly inflicted on Serca's image, Cano Jr. testified that he alone had calculated that figure to be $1,000,000. Ex. 2 at 89-92. This is the same person whose deposition catchphrase, while speaking about Serca, was "I don't see the finances." Ex. 2 at 33:13, 38:12, 97:9, 97:12, 117:4, 122:10. This is also the same person who had no idea as to (1) where Serca has its bank account; (2) whether Serca has any outstanding loans; or (3) whether Serca has ever had taxable income of more than a million dollars in any given year. *Id*. at 37, 96. 117. And as can thus be expected from such a person, Cano Jr. was entirely unable at his deposition to provide even the most rudimentary of explanations as to how the $1,000,000 figure was calculated. *Id*. at 89-92.

20.    Based on all of the aforementioned evidence, Defendants ask the Court to find that Defendants are entitled to summary judgment on any and all components of actual damages that a claimant is permitted to seek upon obtaining a finding of liability based on unfair competition by trademark infringement. Defendants ask for a summary judgment that effectively eliminates the need to submit "Special Instruction No. 2: Actual Damages" and "Jury Question No. 2" to a jury, as found in the Court's proposed charge.

21.     Similarly, based on all of the aforementioned evidence, Defendants ask the Court to find that Defendants are entitled to summary judgment on any and all components of actual damages—excluding attorney fees—that a claimant is permitted to seek upon obtaining a finding of liability for misrepresentation under the DMCA. Defendants ask for a summary judgment that effectively eliminates the need to submit "Jury Question No. 5" to the jury as currently framed in the Court's proposed charge. To the extent some form of that question would still need to be presented to the jury after the granting of the summary-judgment relief requested herein, the revised question would simply call on the jury to decide what sum of money would fairly and reasonably compensate Serca for its attorney fees—without reference to "damages" generally.

22.     After five years of litigation and multiple trial settings, Serca has failed to produce any evidence of actual damages. Serca's total failure to provide any evidence of actual damages is fatal. Moreover, Serca must not be allowed to appear at trial and suddenly come up with entirely new evidence of actual damages. If Serca was to offer evidence at trial that is contrary to the testimony provided during the discovery phase of this litigation, that conduct would constitute "trial by ambush" (an enormous understatement) and would be patently unfair and unjust.

## Prayer

Defendants ask the Court to grant them summary judgment on any and all components of actual damages—with the exception of legal fees and expenses, to the extent such items can be considered actual damages—for which Serca may seek compensation through its remaining claims. Granting this motion serves the ends of justice.

Respectfully submitted,

/s/ *Raymond Thomas*
Raymond L. Thomas*
S.D. Tex. No. 10715

24

rthomas@raythomaspc.com
Olegario Garcia
S.D. Tex. No. 2202345
ogarcia@raythomaspc.com
**RAY THOMAS, PC**
4900-B North 10th Street
McAllen, Texas 78504
p. 956.632.5033
f. 956.630.5199
*Counsel for Plaintiffs/Counter-*
*Defendants*

**\*Attorney-in-Charge for**
**Defendants**

## CERTIFICATE OF SERVICE

On May 23, 2023, a true and correct copy of the foregoing instrument was served on the following persons in accordance with the Federal Rules of Civil Procedure:

**Via E-File**
Yocel Alonso
*Counsel for Plaintiff*

/s/ ***Raymond L. Thomas***
Raymond L. Thomas